UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In the Matter of

      BEST PAYPHONES, INC.,                    Case No. 1:08-cv-07339-PGG

                         Debtor.

------------------------------------------------------------------X


### BEST PAYPHONES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPEAL FROM THE FINAL JUDGMENT ENTERED ON MARCH 20, 2008


                                    DAVID BOLTON, P.C.
                                    666 Old Country Road, Suite 509

Of Counsel:                        Garden City, New York 11530
                                    (516) 222-0600

     David Bolton, Esq.

                                    Appellate Counsel to Best Payphones, Inc.

## TABLE OF CONTENTS  PAGE

**ORDER APPEALED FROM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Best Payphones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Meltel's Disconnect Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Best Files For Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Meltel's Proof of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**I**

**IF METTEL HAD ANY RIGHTS UNDER THE NATELCO
AGREEMENT (WHICH IS NOT CONCEDED) METTEL'S
ANTICIPATORY BREACH OF THAT AGREEMENT EXCUSED
ANY OBLIGATION BEST HAD UNDER THE AGREEMENT, INCLUDING
THE DUTY TO PROVIDE NOTICE AND AN OPPORTUNITY TO CURE** . . . . . . . . . . . 6

    A.    The Disconnect Notice Constituted An
          Anticipatory Repudiation of the Natelco Agreement . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    MetTel's Anticipatory Repudiation Excused
          Any Obligation Best Had to Provide Notice to Cure . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    Best Was Not Required to Provided Notice to Cure
          Because MetTel's Disconnect Notice Gave Just 10 Days Notice . . . . . . . . . . . . 13

**II**

**BEST DID NOT BREACH THE NATELCO
AGREEMENT WHEN IT REJECTED
METTEL AS AN UNAUTHORIZED CARRIER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    MetTel Had No Rights Under the Natelco Agreement . . . . . . . . . . . . . . . . . . . . . 17

B.  New York Public Service Law Prohibits A
Telecommunications Carrier, Such As MetTel,
From Providing Service To A Customer Without
the Customer's Consent and Best Had The Absolute
Right To Reject MetTel As An Unauthorized Carrier . . . . . . . . . . . . . . . . . . . . . 21

C.  Best Had the Right, Under the FCC Waiver Which
MetTel Sought and Obtained, To Select A Different Carrier . . . . . . . . . . . . . . 24

D.  MetTel Waived Any Right to Rely on the
FCC Waiver Because it Failed to Comply with
the Conditions on Which the Waiver Was Granted . . . . . . . . . . . . . . . . . . . . . . 26

**III**

**THE AWARD OF LOST PROFITS WAS ERRONEOUS** . . . . . . . . . . . . . . . . . . . . . . . 27

A.  Lost Profits under the Natelco Agreement
Were Not Within the Contemplation of the Parties . . . . . . . . . . . . . . . . . . . . . . 27

B.  Natelco Was Not Ready, Willing and Able to
Provide Service to Best at the Time of the Alleged
Breach, and MetTel Did Not Have the Right to Do So . . . . . . . . . . . . . . . . . . . 29

C.  The Bankruptcy Court Erred When it Based the Award on
Proof of Usage under a Prior Agreement Between Best and
MetTel, Not on the Actual Usage under the Natelco Agreement . . . . . . . . . . . 30

D.  The Bankruptcy Court Erred When it Allowed MetTel to
Calculate Lost Profits Based on its Expenses, Not Natelco's . . . . . . . . . . . . . . 32

E.  The Bankruptcy Court Erred When It Included In
MetTel's Lost Profits The FCC Line Charge Of $8.08 . . . . . . . . . . . . . . . . . . . 33

**IV**

**EVEN IF THE NATELCO AGREEMENT WERE PROPERLY
ASSIGNED, BEST HAD THE RIGHT TO TERMINATE THE
AGREEMENT BECAUSE THERE WAS A MATERIAL CHANGE** . . . . . . . . . . . . . . . . 34

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES                                                  PAGE

**About.com, Inc. v. Targetfirst, Inc.,**
   01 CV 1665 (GBD), 2003 WL 942134 (Daniels, J.)(S.D.N.Y. March 10, 2003) . . . . . . 7

**Allbrand Discount Liquors, Inc. v. Times Square Stores,**
   60 A.D.2d 568, 399 N.Y.S.2d 700 (2nd Dep't 1977), . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Alpine Courts, Inc. v. Martina Wiederman,**
   34 A.D.2d 951, 953, 312 N.Y.S.2d 718 (2nd Dep't 1970) . . . . . . . . . . . . . . . . . . . . . . . . 9

**American List Corp. v. U.S. News and World Report, Inc.,**
   75 N.Y.2d 38, 550 N.Y.S.2d 590 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Bausch & Lomb Inc. v. Bressler,**
   977 F.2d 720 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Caisse Nationale De Credit Agricole v. CBI Indus.**
   90 F.3d 1264 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Coin Phones, Inc. (Balaber-Strauss v. New York Telephone),**
   203 B.R. 184 (Bankr. S.D.N.Y. 1996), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.**
   301 A.D.2d 70, 747 N.Y.S.2d 468 (1st Dep't 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Concorde Financial Corp. v. Value Line, Inc.,**
   2004 U.S. Dist. LEXIS 14382 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Created Gemstones, Inc. v. Union Carbide Corp.,**
   47 N.Y.2d 250, 417 N.Y.S.2d 905 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**D.C.R. Trucking & Excavation, Inc. v. Aetna Casualty and Surety Co.,**
   2002 WL 32096594 (E.D.N.Y. Oct. 31, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**First National Bank of Omaha v. Three Dimension Systems Products, Inc.,**
   289 F.3d 542 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Freund v. Washington Square Press, Inc.,**
   34 N.Y.2d 379, 357 N.Y.S.2d 857 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Furlong v. Shalala,**
   156 F.3d 384 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Karabu v. Pension Benefit Guaranty Corp.,**
      1997 WL 759462, 96 Civ. 4960 (S.D.N.Y. December 10, 1997);   . . . . . . . . . . . . . . . . . 8

**Needham v. Candie's, Inc.,**
      2002 WL 1896892, 01 Civ. 7184 (S.D.N.Y. August 16, 2002) . . . . . . . . . . . . . . . . . . . . . 9

**Palazzetti Import/Export, Inc. v. Morson,**
2001 U.S. Dist. LEXIS 20243 (S.D.N.Y. Dec. 6, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Penthouse International, Ltd. v. Dominion Savings and Loan Assn.,**
      855 F.2d 963 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Pitcher v. Benderson-Wainberg Associates II, I.T.,**
      277 A.D.2d 586, 715 N.Y.S.2d 104 (3rd Dep't. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**REA Express, Inc. v. Interway Corp.,**
      538 F.2d 953 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Record Club of America, Inc. v. United Artists Records, Inc.,**
      643 F. Supp. 925 (SDNY 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**SPI Communications, Inc. v. WTZA-TV Associates Ltd.,**
      229 A.D.2d 644, 644 N.Y.S.2d 788 (3d Dep't 1996);   . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Texas Trading & Milling Corp., v. H.I.T. Corp.,**
      1986 U.S. Dist. LEXIS 20873 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Travelers Int'l A.G. v. Trans World Airlines,**
      41 F.3d 1570 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**United Cal. Bank v. Prudential Ins. Co.,**
      140 Ariz. 238, 681 P.2d 390 (Ct. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Wolff & Munier, Inc. v. Whiting Turner Contracting Co.,**
      946 F.2d 1003 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**ORDER APPEALED FROM**

Best appeals to this court from the Opinion dated May 8, 2007 and entered on May 17, 2007 and the judgment entered thereon, which awarded MetTel lost profits.

**STATEMENT OF ISSUES PRESENTED**

By opinion dated May 8, 2007, the bankruptcy court allowed a proof of claim filed by Manhattan Telecommunications Corp. ("MetTel") in the sum of $238,082.43, plus interest. The entire amount awarded was for alleged "lost profits" based on the claimed breach of contract by Best Payphones, Inc. ("Best").

The contract at issue (the "Natelco Agreement") is dated December 8, 2000 and was between Best and North American Telecommunications Corporation ("Natelco"). MetTel asserted rights under the Natelco Agreement as the alleged assignee of the Natelco Agreement.

The issues presented on this appeal are as follows:

1.      Assuming that MetTel had rights under the Natelco Agreement, did MetTel commit an anticipatory repudiation of the Natelco Agreement?

2.      Did MetTel's anticipatory repudiation obviate or otherwise excuse Best's obligation to comply with the Natelco Agreement, including the obligation to provide notice of breach and an opportunity to cure?

3.      Assuming that Best had an obligation to provide notice to cure, was Best's obligation to provide 10 <u>business</u> days notice excused because MetTel gave Best just 10 <u>days</u> notice that service would be suspended to approximately 900 of Best's public pay phones?

4.      Did Best breach the Natelco Agreement on May 15, 2001 when it refused to accept MetTel as an unauthorized telecommunications carrier?

5.      Did the bankruptcy court err when it awarded MetTel lost profits calculated based

on a telephone bills MetTel rendered to Best pursuant to a prior contract unrelated to the Natelco

Agreement, which contract expired over five months before the alleged breach of the Natelco

Agreement, rather than on telephone bills Natelco rendered to Best?

6.      Did the bankruptcy court err when it included as "revenue" in the calculation of

lost profits an FCC Line Charge of $8.08 per line.

## STATEMENT OF FACTS

### Best Payphones

At all relevant times, Best was the owner/operator of approximately 900 public pay

telephones ("PPTs") located in and around New York City.  12/13 Tr. at p. 18-19.[1]

New York City imposes substantial penalties on operators of PPTs if their PPTs do not

have dial tone service on just two occasions within any three month period.  See 67 RCNY § 6-

02 ($2,500 per violation).  Accordingly, it was crucial to Best that service to its PPTs not be

interrupted.  In addition, PPTs which do not have service are more likely to be vandalized.  12/13

Tr. at 107-108.

In or about September, 1999, Best entered into a contract with MetTel (the "MetTel

Agreement"), pursuant to which MetTel was to provide Best with telephone service.  Exh. 26.[2]

MetTel was unable to provide acceptable service to Best and, accordingly, Best sought out a

different service provider.  12/13 Tr. at p. 27.

In December, 2000, Best signed the Natelco Agreement whereby Natelco agreed, among

other things, to provide local and regional service to Best's PPTs.  Exh. 11.

_____

[1]      The trial occurred over the course of three days.  References to the transcript are by date
and page.

[2]      References denoted "Exh." are to the trial exhibits.

2

In February, 2000, MetTel brought an action against Best, in Supreme Court, New York County, seeking to recover amounts claimed to be due under the MetTel Agreement. Opinion at p. 2-3. In that action a judgment was entered against Best, and in favor of MetTel, in the sum of $185,205.68 (the "Judgment"). *Id.* Best filed an appeal from the Judgment and posted an undertaking in connection with the appeal. Exhibit Z at ¶ 5.

Natelco filed for bankruptcy on February 23, 2001. Exh. 4.

During its bankruptcy case, Natelco entered into an asset purchase agreement with MetTel, pursuant to which MetTel agreed to acquire certain assets, including, allegedly, the Natelco Agreement. Ex. 3.

Best objected to MetTel acquiring the Natelco Agreement because, based on MetTel's past history, Best did not believe that MetTel could provide proper service and, when Best transferred service from MetTel to Natelco in December 2000, MetTel *intentionally* interfered with the process, causing Best to suffer substantial damage. Exh 14; 12/13 Tr. at p. 50-51. In addition, Best was concerned that MetTel would attempt to terminate future service for alleged non-payment of past bills. Exh. 14 at ¶ 13. (Best, it turned out, was quite prescient).

By order entered on May 17, 2001, the bankruptcy court approved the Natelco/MetTel sale. Exh. 32.

**MetTel's Disconnect Notice**

On May 8, 2001, MetTel sent Best a "Final Disconnect Notice" (the "Disconnect Notice") demanding payment of monies allegedly due to Natelco, under the Natelco Agreement, and due to MetTel, on account of the Judgment and threatening Best that, if the monies demanded were not paid within 10 days, MetTel would suspend service to Best's PPTs. Exh. 23.

MetTel sent this notice despite the fact that the Sale Order had not yet been entered and despite the fact that MetTel, thus, had no rights under or to enforce the Natelco Agreement.

MetTel did not disguise the fact that MetTel was demanding – as a condition to its continued performance under the Natelco Agreement – that Best pay the Judgment. Thus the Disconnect Notice stated:

> The following represents a breakdown of the amount due to MetTel:
>
> - Judgment of Past Due Amount          $185,205.56
> - March 1, 2001 Invoice (Natelco)       41,703.01
> - April 1, 2001 Invoice (Natelco)       40,419.92[3]

The Disconnect Notice stated, in no uncertain terms, that:

> Payment of $267,328.61 is required by May 18, 2001 to avoid the suspension of your outgoing service on the following business day. Ten days later your service will be disconnected.

Exh. 23.

As discussed below, MetTel had no right to condition its performance under the Natelco Agreement (if it had any rights under that agreement, which is not conceded) upon compliance with extra contractual conditions (payment of the Judgment). Accordingly, the Disconnect Notice constituted an anticipatory repudiation of the Natelco Agreement.

If MetTel was permitted to suspend service to Best's PPTS, that would have resulted in vast business damages to Best, including lost revenues and profits, loss of good will, regulatory sanctions, and increased vandalism. *See* page 2, *supra*. Accordingly, the Disconnect Notice

---

[3]     The monies claimed to be due for the April 1, 2001 invoice were <u>not</u> due as of May 8, 2001. As MetTel admitted during the trial, the April 1, 2001 invoice was not sent to Best until the "middle of May." 12/4 Tr. at 46. Accordingly, the bankruptcy court's statement that Best moved its lines in May, 2001 to avoid paying MetTel is incorrect. Best took immediate action in response to MetTel's wrongful and overt threat to take actions which would destroy Best's business.

constituted a gross and immediate threat which Best could not ignore.

In addition, in 2000, MetTel sent Best a similar disconnect notice (Best was, at that time, MetTel's customer), threatening to suspend service to Best's PPTs on December 15, 2000  unless Best made payment of amounts MetTel claimed were due.  12/13 Tr. at p. 50.  MetTel, however, did not wait until December 15 to suspend service to Best's PPTs.  12/13 Tr. at 50-51.  Michael Thacker, account manager at MetTel, told Best that MetTel did this in order to "get Best's attention."  Best could not risk another episode like this.

Best took MetTel at its word – that MetTel would terminate service to Best's PPTs unless Best paid all amounts which were demanded.  Because MetTel had no right to demand payment of the Judgment as a condition to the continuation of service, and because Best was appealing the Judgment, Best took the only step available to it to avoid suspension of its service – Best immediately located an alternate service provider.  On May 15, 2001, Best signed an agreement with that carrier (BridgeCom) and began to migrate its telephone lines from MetTel to BridgeCom.  Exh 25.

Finally, at the time the Notice of Disconnection, that the Bankruptcy Court found to be an anticipatory breach which in effect terminated the Natelco Agreement, was received, Best had a number of credits due to it by virtue of a $45,000 deposit that it had placed with Natelco and a prepayment of approximately $18,000 for services.  MetTel conceded that Best was due these credits in September of 2002 (BX Z-1 ¶ 16), fifteen months after they should have been applied. Additionally, Best, at or about the same time, was also offered a discount of more than $16,000, 20% off of the Natelco invoices.  BX Z-1 ¶ 11.  Furthermore, at the time that the Notice of Disconnection was received, MetTel had not yet sent the April 1, 2001 invoice or bill, it was sent

5

in the <u>middle</u> of May. Tr. 12-4-06 p. 46 l. 5. Thus, on May 9, 2001, the date of the Notice of

Disconnection was received, Best had only received the March 1, 2001, Natelco invoice, in the

approximate amount of $42,000 (MX 23), when Best had a credit due of approximately $63,000.

And in or around the same time an additional discount of $16,000 was offered. And, as shown

above, according to MetTel's own testimony, Best had not been notified that the Natelco

Agreement was assigned to MetTel until the middle of May (Best does not concede that MetTel

sent any notification letter, let alone the notification letter that MetTel purported to send,

pursuant to the FCC Waiver Order).

## Best Files For Bankruptcy

Best filed for bankruptcy protection in 2001.

## MetTel's Proof of Claim

MetTel filed a proof of claim in Best's bankruptcy case seeking to recover, among other

things, lost profits, based on Best's alleged premature termination of the Natelco Agreement.

Exh. 1.

## ARGUMENT

### I

### IF METTEL HAD ANY RIGHTS UNDER THE NATELCO AGREEMENT (WHICH IS NOT CONCEDED) METTEL'S ANTICIPATORY BREACH OF THAT AGREEMENT EXCUSED ANY OBLIGATION BEST HAD UNDER THE AGREEMENT, INCLUDING THE DUTY TO PROVIDE NOTICE AND AN OPPORTUNITY TO CURE

The bankruptcy court correctly found that (to the extent MetTel had any rights under the

Natelco Agreement) the Disconnect Notice constituted an anticipatory breach of the agreement

because MetTel conditioned its future performance of the Natelco Agreement on compliance

6

with extra-contractual terms (payment of the Judgment). Opinion, p. 10. The bankruptcy court

erred, however, when it determined that it was Best which breached the Natelco Agreement

because it failed to provide MetTel with 10 business days notice of breach and opportunity to

cure. As shown below, Best had the right to accept MetTel's word that it would suspend service

to Best's PPTs unless Best paid amounts which indisputably were not due under the Natelco

Agreement. Best's actions which were taken in order to preserve telephone service to its PPTs

were reasonable under the circumstances.

Because MetTel repudiated the Natelco Agreement it had no right to assert a claim

against Best for lost profits and the bankruptcy court's award of such damages was erroneous.

## A.    The Disconnect Notice Constituted An Anticipatory Repudiation Of The Natelco Agreement

As the bankruptcy court correctly found, a parties' statement that it will not perform

under a contract unless the other party complies with extra-contractual conditions constitutes an

anticipatory repudiation justifying the other party to consider the contract terminated. Opinion,

p. 10. *See Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 417 N.Y.S.2d 905

(1979); *SPI Communications, Inc. v. WTZA-TV Associates Ltd*, 229 A.D.2d 644, 644 N.Y.S.2d

788 (3d Dep't 1996); *About.com, Inc. v. Targetfirst, Inc*, 01 CV 1665 (GBD), 2003 WL 942134

(Daniels, J.)(S.D.N.Y. March 10, 2003). *See also Texas Trading & Milling Corp., v. H.I.T*

*Corp.*, 1986 U.S. Dist. LEXIS 20873, *25-26 (S.D.N.Y. 1986)("From the [Disconnect Notice] it

is clear that [MetTel] repudiated the contract. While it [may have appeared] in its final

[disconnect notice] . . . that it was ready, willing and able to perform its part of the contract . . . it

was only . . . on its own terms [*i.e.*, Best had to also pay the judgment] . . . [Best] was thus

justified in cancelling the contract.")(following Created Gemstones)).

7

Here, as the bankruptcy court found, MetTel "breached the Natelco Agreement because the Notice of Disconnection also insisted on the payment of the unrelated debt." Opinion, page 10. This constituted an anticipatory repudiation of the Natelco Agreement which relieved Best of any obligation to perform under the contract. *See REA Express, Inc v Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976), in which the Court held that a contracting party's insistence on preconditions to performance not stated in the contract constitutes an anticipatory repudiation. Indeed, MetTel conceded at trial that "that judgment amount shouldn't have been part of the disconnect letter." 12/4 Tr. at p. 59.

As the alleged assignee of the Natelco Agreement, MetTel stood in Natelco's shoes and did not obtain any greater rights than those possessed by Natelco. *See, generally, Furlong v Shalala*, 156 F.3d 384, 392 (2nd Cir. 1998). MetTel, thus, was contractually obligated to provide telephone service to Best for the consideration provided under the Natelco Agreement. Since Natelco had no right to condition its performance upon Best's payment of money due to MetTel under an unrelated contract, MetTel could not do this.

As the bankruptcy court correctly found, the Disconnect Notice constituted an anticipatory repudiation of the Natelco Agreement because MetTel demanded compliance with extra-contractual obligations.

**B.      MetTel's Anticipatory Repudiation**
**Excused Any Obligation Best Had To Provide Notice To Cure**

The bankruptcy court erred when it held that – despite MetTel's anticipatory repudiation of the Natelco Agreement – Best had to provide MetTel with notice and an opportunity to cure. This ruling ignored long settled-law which holds that one party's anticipatory repudiation of a contract <u>obviates</u> the other party's duty to provide notice and an opportunity to cure. *See Karabu*

8

*v. Pension Benefit Guaranty Corp.*, 1997 WL 759462, *8, 11, 96 Civ. 4960 (S.D.N.Y. December 10, 1997); *Palazzetti Import/Export, Inc. v. Morson*, 2001 U.S. Dist. LEXIS 20243, at *28 (S.D.N.Y. Dec. 6, 2001), *aff'd*, 54 Fed. Appx. 698 (2d Cir. 2002)(jury's finding of anticipatory breach excused obligation to provide notice to cure). *See also Needham v. Candie's, Inc.*, 2002 WL 1896892, *4, 01 Civ. 7184 (S.D.N.Y. August 16, 2002), in which the Court stated that a party to a contract may terminate a contract immediately, without providing notice and opportunity to cure, if the other party has expressly repudiated the contract. Other courts have reached the same conclusion; *Caisse Nationale De Credit Agricole v. CBI Indus.* 90 F.3d 1264, 1275 (7th Cir. 1996)(citing numerous cases); *First National Bank of Omaha v. Three Dimension Systems Products, Inc.*, 289 F.3d 542, n2 (8th Cir. 2002)(anticipatory breach excuses the other party from having to give notice and an opportunity to cure....").

These cases are entirely consistent with the long line of cases which hold that, upon an anticipatory repudiation, the other party is excused from complying with conditions precedent contained in the contract. *See e.g., Concorde Financial Corp. v. Value Line, Inc.*, 2004 U.S. Dist. LEXIS 14382, at *12 (S.D.N.Y. 2004)(anticipatory breach relieves other party of performance of futile acts or conditions precedent); *American List Corp. v. U.S. News and World Report, Inc*, 75 N.Y.2d 38, 44, 550 N.Y.S.2d 590, 594 (anticipatory repudiation "relieves the nonrepudiating party of its obligation of future performance"); *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 747 N.Y.S.2d 468 (1st Dep't 2002)(anticipatory repudiation discharges the other party's obligations to perform under the contract in the future); *Pitcher v. Benderson-Wainberg Associates II, I.T.*, 277 A.D.2d 586, 587, 715 N.Y.S.2d 104,106 (3rd Dep't. 2000)(same); *Alpine Courts, Inc. v. Martina Wiederman, 34*

9

*A.D.2d 951, 953, 312 N.Y.S.2d 718 (2nd Dep't 1970)(*"anticipatory repudiation excused tender of performance as well as all other conditions of their agreement*")*.

There is no reason why anticipatory repudiation of a contract excuses the obligation to comply with the contract in its entirety – including performance of conditions precedent – but does not excuse the obligation to comply with a part of a contract (an obligation to provide notice and an opportunity to cure). Simply put, MetTel's repudiation put an end to the Natelco Agreement and excused Best from complying therewith.

Because the Disconnect Notice was a clear and unequivocal statement that MetTel would not perform under the Natelco Agreement (as the bankruptcy court found), Best was entitled to take MetTel at its word that it would disconnect Best's telephone service unless it paid monies which were not due under the Natelco Agreement. Best was not required to attempt to convince MetTel that it's chosen position was ill-advised. *See e.g , Allbrand Discount Liquors, Inc. v. Times Square Stores,* 60 A.D.2d 568, 399 N.Y.S.2d 700 (2nd Dep't 1977), holding that "[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent."[4]

The bankruptcy court recognized that the *Caisse, Palazetti, and Concorde* cases stand for the proposition that the obligation to give notice and an opportunity to cure is excused by an anticipatory repudiation. Opinion, page 13. But the court erred when it distinguished the cases by finding that the overt and threatening language of the Disconnect Notice (including the opening line "This is a final disconnect notice") was rendered "equivocal" because MetTel

---

[4]     The bankruptcy court's statements that Best did not give notice and opportunity to cure because it did not want to do business with MetTel and because it did not want MetTel to issue a proper demand for payment, is erroneous (for the reasons discussed above) as well as irrelevant. Best had no duty or obligation to provide notice to cure following MetTel's anticipatory repudiation.

concluded the Disconnect Notice with the boilerplate line "[i]f you have any questions about your bill please call me at (212) 607-2166."[5]  The Disconnect Notice made it chillingly plain that MetTel was going to suspend service to Best's lines unless $267,328.61 was paid by May 18, 2001 and then disconnect the lines.  The mere fact that MetTel concluded the letter with what is a most a polite (but meaningless) phrase does not alter that conclusion.  Indeed, the language does not remotely imply that if Best called about the Disconnect Notice MetTel would have rescinded the demand for payment of the Judgment as a condition to future performance under the Natelco Agreement.

Further, the demand for payment was not a "bill."  The Disconnect Notice did not ask Best to call if it had any questions about the Disconnect Notice, or the threats MetTel was making, and it did not invite discourse about MetTel's wrongful demands.  And, no MetTel witness ever referred to the Disconnect Notice as a "bill."  Finally, the reference to "your bill" unquestionably did not refer to the improper extracontractual demand for payment of an unrelated judgment, and the Disconnect Notice thus was an unconditional demand for payment of the judgment as a condition of future service.

Finally, the opinion speculates about alleged subjective thoughts by the parties.  We

---

[5]       The bankruptcy court's statement that the Disconnect Notice was equivocal is quite surprising because, during argument of a prior motion for summary judgment, the bankruptcy court was clear that, in its view, the Disconnect Notice meant what it said – that MetTel would disconnect Best's service if it did not pay $267,000.  Thus, the bankruptcy court stated:

> If you're saying that you were demanding $267,000 but if you paid us 80,
> we would have continued to give you service, that's not what that letter
> says. Why don't we move off that, because you're not going to convince
> me this is more than a letter saying, We're going to disconnect you if you
> don't pay $267,000.

Transcript, March 25, 2004 at p. 18.

respectfully maintain such comments were inappropriate, since "The test for an anticipatory repudiation is an objective one and good faith is immaterial." *See* J. Calamari & J. Perillo, The Law of Contracts § 12-6, at 461 (2d ed. 1977) (citing 4 A. Corbin, Corbin on Contracts § 973 (1951); United Cal. Bank v. Prudential Ins. Co., 140 Ariz. 238, 278-79, 681 P.2d 390, 430-31 (Ct. App. 1983). Whatever the breaching party's state of mind, the impact on the innocent party is the same – he faces total loss of the repudiator's performance, to which the contract entitled him. This principle is in accord with the Restatement of Contracts which provides that "a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." Record Club of America, Inc. v. United Artists Records, Inc., 643 F. Supp. 925 (SDNY 1986), vacated on other grounds, 890 F. 2d 1964 (2d Cir. 1989).

In addition, the cases the bankruptcy court relied on are inapposite.

Thus, *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720 (2nd Cir. 1992), did not involve an anticipatory repudiation, let alone a clear and unambiguous demand for compliance with extra-contractual conditions. Indeed, the Second Circuit specifically distinguished the facts before it from those situations where, as here, the repudiating party "expressly disavowed any further duties under the contract at issue, in effect declaring the contract at end." Id. 977 F.2d at 728. Moreover, the Second Circuit stated that "B&L did not unilaterally terminate the Agreement; rather, B&L invoked its rights under the Agreement..." and it relied on the District Court's finding that "B&L and Sonomed had a good faith difference of opinion with respect to whether Sonomed had cured its default." Further, Bausch & Lomb "attempted to withdraw its alleged repudiation within the 30 day [cure] period." Here, MetTel did not purport to invoke its rights under the Natelco Agreement, it expressly coupled future performance with extra-contractual

12

conditions. And there was no "good faith" dispute. Neither of the other cases cited by the bankruptcy court involved an anticipatory breach.

**C.   Best Was Not Required To Provide Notice To Cure**
      **<u>Because MetTel's Disconnect Notice Gave Just 10 Days Notice</u>**

The Natelco Agreement gave MetTel 10 <u>business</u> days to cure a breach following "the date written Notice is given." Exh. 11, p. 7. But in the Disconnect Notice, MetTel gave Best just 10 days notice that service to its PPTs would be suspended. It is axiomatic that MetTel's notice period would expire days before the "cure" period (both because of the difference between "business days" and "days" and because of the delay between issuance and receipt of notice). Best, thus, was placed in an untenable position – MetTel could begin to suspend service to Best's PPTS before the "cure period" expired.

Accordingly, even if Best had an obligation to provide notice and an opportunity to cure, MetTel waived or is otherwise preluded from asserting the right to receive such notice because the amount of time MetTel chose to give Best in the Disconnect Notice was less than the cure period provided for in the Natelco Agreement.

The bankruptcy court disregarded this argument based on its finding that MetTel "could have cured its breach within the cure period...." Opinion, p. 12. The court concluded that "[t]he fact that Best faced a business risk if MetTel failed to cure more promptly than the time allotted under the contract does not change the conclusion." *Id.* at 12-13. These conclusions are wrong, as a matter of law.

It is obvious that almost every party will claim (as MetTel does here) that it would have cured its breach if only notice had been given (especially if such "cure" involves the mere withdrawal a wrongful demand for performance). But this misses the point. MetTel could have

given Best 15 days notice, 20 days notice, or any other number of days to pay the amounts it was (wrongfully) demanding. But MetTel chose to give Best just ten days notice. This put Best in the untenable position of losing service to its PPTs because the 10 business day cure period expired after the deadline MetTel set in the Disconnect Notice. Again, Best was entitled to take MetTel at its word and react based on the Disconnect Notice MetTel sent. Best was not required to gamble that MetTel did not mean what it said or that it would reverse course if Best objected.

There can be no dispute that a party can waive contractual rights by its conduct. *See e.g.*, *Wolff & Munier, Inc. v. Whiting Turner Contracting Co.*, 946 F.2d 1003, 1008-1009 (2nd Cir. 1991)(party waived right to notice to cure because its words and conduct demonstrated that it would not complete the contract). Because MetTel gave Best significantly less time to pay than the cure period provided in the Natelco Agreement, MetTel waived the right to receive notice and an opportunity to cure. *See e.g. D.C.R. Trucking & Excavation, Inc v. Aetna Casualty and Surety Co.*, 2002 WL 32096594, at *7 (E.D.N.Y. Oct. 31, 2002), holding that when one party's performance of a condition precedent is "frustrated or precluded" by the other party, the latter "cannot rely on the other's failure to perform as a defense to an action to enforce the contract."

Here, if Best permitted MetTel to suspend service to its PPTs this would have caused a devastating effect on Best's business and injured the public which used Best's phones to communicate. Indeed, it was uncontroverted at trial that, if Best lost service to its lines, Best was subject to fines from the City of New York up to $2,500 per-day/per-phone, Best would lose the good will of the patrons of the PPTs, the owners of the locations where the phones were installed would complain because they too would lose revenue, and phones which do not work are subject to vandalism. 12/13 Tr. at pp. 107-108. Indeed, in *In re Coin Phones, Inc. (Balaber-Strauss v.*

14

*New York Telephone)*, 203 B.R. 184, 190 (Bankr. S.D.N.Y. 1996), the Court recognized the damage an operator of PPTs will suffer if its service is disconnected, as follows: "[t]he threat of interruption of service was a mortal threat to CPI. Aside from the obvious fact that CPI could not derive any income from its assets if service were interrupted, witnesses for both parties testified, based upon experience, that a coin-operated telephone which is inoperable for any reason will almost certainly be vandalized, destroyed or physically removed by frustrated would-be users or by the location owner within a few days."

The bankruptcy court avoided this conclusion by finding that this was a "business risk" which Best faced under the terms of the contract. Opinion, p. 12. This misses the point. MetTel could have given Best more time to comply with its (wrongful) demand. Yet MetTel chose to give only 10 days. MetTel must live with the consequences of its actions. Moreover, no case has been found which holds that the untenable situation which MetTel created when it chose to provide less time to comply than the contractual cure period constitutes a "business risk" which Best was required to accept. *Bausch & Lomb*, which the bankruptcy court cited, is inapposite. Here, the "risk" Best faced arose solely and exclusively from MetTel's actions. In *Bausch & Lomb* the issue was external (the "selling season" that presented the "business risk" in that case was not determined by Bausch & Lomb) and had not been created by Bausch & Lomb.

## II

### BEST DID NOT BREACH THE NATELCO AGREEMENT WHEN IT REJECTED METTEL AS AN UNAUTHORIZED CARRIER

If MetTel had no rights under the Natelco Agreement on May 15, 2001 then Best could not have breached that agreement when it refused to accept MetTel as its telecommunications carrier. Alternatively, if Best had the legal right, on May 15, 2001, to reject MetTel as its carrier, then Best could not have breached the Natelco Agreement when it transferred service for its PPTs to BridgeCom.

As shown below, MetTel was an interloper which had no right to foist itself on Best as Best's telecommunications carrier without Best's prior consent. And Best, like any other customer, had the right to reject MetTel's unilateral attempt to do so. Best, however, could not return to Natelco (which was unable to provide service) so Best transferred its lines to a different carrier (BridgeCom).

Attempting to demonstrate that it had the right to be Best's telecommunications provider in May, 2001, MetTel relied on an order entered in Natelco's bankruptcy case which approved the sale of assets to MetTel (the "Sale Order"). Exh. 32. The bankruptcy court too relied on the Sale Order. But this reliance was entirely misplaced because the Sale Order was not entered (and thus was not effective) until May 17, 2001 – which was after MetTel sent the Disconnect Notice, after Best rejected MetTel as an unauthorized carrier, and after Best transferred service to BridgeCom. *See* Exh 32 at ¶ 32.

While it may have been expedient for MetTel to start providing service to Natelco's

16

customers before the Sale Order became effective, MetTel did this at its own risk.[6]  Since there

was no court order allowing MetTel to be Best's carrier Best had the absolute right to reject

MetTel.

In addition, bankruptcy court approval for the transfer of customers from Natelco to

MetTel was not all that was required.  Both the Federal Communications Commission and the

New York Public Service Commission (the "PSC") have rules and regulations which must be

complied with before a telecommunications carrier (such as MetTel) may provide service to

another carrier's (Natelco's) customer.  Simply stated a carrier cannot provide service to a

customer without that customer's prior consent.  Here, rather than seeking consent from all of

Natelco's customers, MetTel sought a waiver of the consent requirement from both the FCC and

the PSC.  As shown below, MetTel did not obtain from the PSC approval to provide services to

Natelco's customers until May 23,2001 – which was after Best moved to BridgeCom.  Further,

while MetTel did obtain a waiver MetTel obtained from the Federal Communications

Commission, MetTel failed to comply with the terms of the waiver it obtained and, in any event,

under the waiver MetTel obtained from the FCC Best had the right to change carriers.

**A.**     **MetTel Had No Rights Under The Natelco Agreement**

It is axiomatic that MetTel could not have suffered any damage from the alleged breach

of the Natelco Agreement on May 15, 2001 unless MetTel had rights under the agreement on that

date.  Accordingly, MetTel has argued, and the bankruptcy Court found, that MetTel was a party

to the Natelco Agreement on May 15, 2001 (when Best transferred service to BridgeCom).  This

---

[6]     As of April, 2001, Natelco was no longer able to provide service to its customers.
Accordingly, it seems apparent that MetTel decided to provide service to the Natelco customers it was
seeking to acquire, even though the Sale Order was not signed or entered, in order to preserve the value
of the assets (the customer base) it was purchasing.

conclusion is erroneous, as a matter of law, because the only way for the assignment and assumption of the Natelco Agreement to be effective was for the bankruptcy court to approve that transaction. *See* 11 U.S.C. § 365(a). Here, the Sale Order was not entered, and thus was not effective, until May 17, 2001. *See* Exh. 32 at ¶ 32.

There cannot be any serious dispute that the Sale Order was not effective until it was entered on the clerk's docket. See Rule 9021 of the Federal Rules of Bankruptcy Procedure, which provides that a judgment (which is defined by Fed. R. Bankr. P. 9001(7) and 9002(5) to mean any appealable order) is effective upon entry on the docket. See also In re Rebeor, 89 B.R. 314, 320 (N.D. N.Y. 1988)(court's oral ruling "was not operative upon utterance. The order of conversion was an appealable order and was not effective until entered on the docket by the Clerk.").

As stated above, MetTel may have found it expedient to begin providing service to NatTelco's customers before the Sale Order was entered (presumably in order to preserve the assets it was buying) but this does not imbue MetTel with any legal rights.

Since MetTel was not Natelco's assignee until May 17, 2001 (at the earliest), MetTel had no rights under the Natelco Agreement on May 15 and MetTel could not have been damaged as a result of the alleged breach.

Moreover, because MetTel had no legal right to be providing Best with telecommunications services until the Sale Order was entered, Best could not have breached the Natelco Agreement when it signed the Bridgecom contract.

The bankruptcy court avoided this conclusion by finding that Judge Bohanan approved the Natelco/MetTel sale "from the bench on April 25, 2001" and "authorized MetTel to begin

18

immediately to provide service to the former Natelco customers." According to the bankruptcy court, "[o]n May 16, 2001, the bankruptcy court entered a formal order (the "Sale Order") approving the assumption of the Natelco Customer Contracts and their assignment to MetTel."

This conclusion is entirely erroneous.

First, the conclusion that the Natelco court approved the transaction "from the bench" is not reflected in the Sale Order and it is not supported by the transcript of the April 25 proceeding. Exh. 15. Further, the Sale Order provides, at paragraph 32 that "this Order shall be effective and enforceable immediately upon entry." Exh. 32. If the assignment of the Natelco Agreement had been approved on April 25, the Sale Order would have explicitly referenced that event. It does not. In addition, the Sale Order refers to the hearing held on April 25 in two places (¶¶ 6 and 7) but never refers to the alleged approval of the transaction as having been made on that date. This mandates the conclusion that the April 25 proceedings did not approve the sale of assets to MetTel. And, the Sale Order itself states, in paragraph L, that the transfer of the assets was "subject to this Order." Again, there is no reference to the April 25 record.

Moreover, the transcript of the April 25 hearing in no way supports the bankruptcy court's finding. Indeed, Natelco's counsel stated that the payphone assets being sold to MetTel were not part of the credit bid being discussed. Exh. 15 at p. 21. The principal issue before the court on April 25 related to a credit bid by Natelco's secured lender to acquire Natelco's non-payphone customer assets. Because the lender could not provide telephone service to Natelco's customers, MetTel was going to act as the lender's designee. Exhibit 15, p. 53-54; 55-56 (where counsel draws a distinction between the "pay phone customers" which MetTel purchased and the "customer base which remains on North American"). What was authorized at the hearing was

19

MCG's credit bid for Natelco's non-payphone assets. Exh. 15 at p.20 ("Obviously, this doesn't included assets which have been sold to anyone else, so obviously we consummated and are still in the process of transferring our payphone access rights to Met-Tel, Mr. Weston's client"). See also pp. 83-84, which states as follows:

THE COURT: Spell it out, just what it is that you want to have so ordered today.

MR. GOTTESMAN: I guess what I want to have so ordered today is the approval of the credit bid - - excuse me, approval of the credit bid consistent with the terms which have been put on the record today - -

THE COURT: That's done. I will order that.

MR. GOTTESMAN: - - pursuant to Section 363 of the Coe and authorizing the debtor in possession - - the debtors in possession to take such actions as are reasonably necessary to effectuate that credit bid, including cooperating on the migration of customers in accordance. So there would - -

THE COURT: I will order that.

MR. GOTTESMAN: In addition, my lender whispered in my ear she would also like to have the 363(m) protection so ordered in today's record as well.

THE COURT: What is 363(m)?

MR. GOTTESMAN: The finding of MCG as a good faith purchaser.

THE COURT: That would be so ordered.

The simple fact is that the Sale Order was not entered until May 17, 2001 (it is dated May 16, as the bankruptcy court found, but it was not entered until the next day). Accordingly, MetTel was acting at its own risk when it began to provide service to Best before the Sale Order was entered. Because MetTel did not have any rights under the Natelco Agreement when Best rejected it as an unauthorized carrier, Best's conduct could not have been a breach of the Natelco Agreement.

Finally, the bankruptcy court states incorrectly in its decision that "Best filed a notice of appeal from the bench order, but District Judge McKenna dismissed the appeal on September 6, 2001, due to Best's failure to comply with *FED. R. BANKR. P. 806 AND 8009.* (MX 34, Ex. D.)." The fact that this statement is incorrect is demonstrated by the Notice of Appeal which Best did file. That document appears as Exh. 17 and clearly states that it was from an order entered on April 18, 2001. There is no evidence in the record to support a conclusion that Best filed a Notice of Appeal from the so-called April 25 "bench order."

**B.    New York Public Service Law Prohibits
        A Telecommunications Carrier, Such As
        MetTel, From Providing Service To A Customer
        Without The Customer's Consent And Best Had
        <u>The Absolute Right To Reject MetTel As An Unauthorized Carrier</u>**

At all times prior to May 15, 2001 (when Best transferred service to Bridgecom), MetTel was providing service to Best without Best's authorization or consent. Under applicable law, MetTel had no right to do this. Accordingly, Best cannot be found to have acted wrongfully, or to have breached the Natelco Agreement, when Best refused to allow an unauthorized carrier to continue as its service provider.

New York Public Service Law, § 92-e(2), provides, in relevant part, that:

> No telephone corporation or any person, firm or corporation acting as an agent or representative of a telephone corporation shall on behalf of a customer make any change or direct a different telephone corporation to make any change in a provider of a telephone service for which there are multiple providers, **unless such corporation,** agent or representative **complies with authorization** and confirmation procedures established by the commission **and by federal law and rules.**

(Emphasis added).[7]

Federal law and rules, specifically 47 CFR 64.1120(a), which is one of the regulations

promulgated by the FCC promulgated pursuant to § 258(a) of the Telecom Act, provides that:

(a)     No telecommunications carrier shall submit or execute a change on the behalf of a
        subscriber in the subscriber's selection of a provider of telecommunications
        service except in accordance with the procedures prescribed in this subpart.

        (1)     No submitting carrier shall submit a change on behalf of a subscriber in
                the subscriber's selection of a provider of telecommunications service
                prior to obtaining:

                (i)     **authorization from the subscriber**; and

                (ii)    verification of that authorization....

(Emphasis added).  This regulation is clear and unambiguous.  No carrier (such as MetTel) can

make someone their customer without that customer's *prior authorization.*[8]

Accordingly, under the New York Public Service law, MetTel could not validly provide

Best with service unless and until it obtained Best's authorization in compliance with 47 CFR

64.1120.

There can be no dispute that, as of May 15, 2001 (when Best left MetTel), MetTel did not

have Best's authorization to provide service and MetTel had not complied with the applicable

_____

[7]     Because New York law requires compliance with the "authorization" procedures
established by Federal law, the bankruptcy court erred, as a matter of law, when it stated that "New York
law does not address the question of... the need for the subscriber's consent...."

[8]     47 CFR 64.1160(g) confirms a customer's right to reject an unauthorized carrier when it
provides that:

        When a LEC [such as Verizon] has assigned a subscriber to a carrier
        without authorization, and where the subscriber has not paid the
        unauthorized charges, the LEC shall switch the subscriber to the desired
        carrier at no cost to the subscriber.

authorization and confirmation procedures. MetTel was, thus, an interloper which had no right

to provide service to Best. Best, like any consumer whose telecommunications service has been

changed without its authorization, had the absolute right to reject the unauthorized carrier, which

Best did not later than May 15, 2001 when it signed an agreement to replace MetTel with

Bridegcom. (Best, of course, could not return to Natelco because Natelco was unable to provide

service to it).

Unable to dispute that it did not have Best's authorization, MetTel argued, and the

bankruptcy court found, that, Best's argument was foreclosed by the Sale Order. This conclusion

was erroneous as a matter of law because, as discussed above, the Sale Order was not entered

until May 17. MetTel, thus, had no rights on May 15 and the Sale Order could not protect

MetTel's actions taken before it was entered.

Further, even if the Sale Order could be used to protect MetTel, the order expressly stated

that: "[t]he Debtors and all applicable parties (including, without limitation, Verizon shall

cooperate and act in accordance with applicable nonbankruptcy law (including all applicable

tariffs) **with respect to the migration of the Debtor's customers**." (Emphasis added).

Applicable non-bankruptcy law, in this context, clearly includes the New York Public

Service Law, the Telecommunications Act, and the rules and regulations promulgated

thereunder. Under those rules, Best was required to authorize any change in carrier – unless

MetTel obtained a waiver of that requirement. *See e g.* Exh. 19 at ¶ 2.

Here, MetTel obtained only a <u>prospective</u> waiver from the PSC – and the PSC waiver was

not entered until May 23, 2001. Exh 21. Accordingly, on May 15, 2001 – the date of Best's

alleged breach – MetTel had no right to be providing service to Best on May 15, 2001 and Best

23

could not have been found to act wrongfully when it rejected MetTel as its carrier.

The bankruptcy court erred when it held (contrary to the clear meaning of this phrase) that this provision did not render the transfer of customers from Natelco to MetTel subject to regulatory approval.  According to the bankruptcy court, "[m]igration referred to the actual switching of the customers from Natelco's lines to MetTel's lines."  Opinion, at p. 27, n. 15. This is far too narrow a reading of the word "migration" because "migration" refers, not just to the physical process of switching carriers, but to the actual transfer of customers from one carrier to another (which is exactly what Natelco and MetTel were doing).  Indeed, the bankruptcy court itself recognized this when it stated, in its decision, that: "To meet Verizon's concern, MetTel filed an emergency petition with the FCC on April 4, 2001 (the "FCC Petition"), seeking a limited waiver of the customer authorization and verification requirements.  The purpose of the limited waiver was to allow the **migration** of the Natelco customers to MetTel without their prior authorization or consent."  Opinion, p. 6 (Emphasis added).  *See also* Opinion, p. 8.  It was error for the bankruptcy court to give the word "migration" its proper meaning in one context, but a more narrow meaning in another.

## C. Best Had The Right, Under The FCC Waiver Which MetTel Sought And Obtained, To Select A Different Carrier

Even if the Court finds that MetTel had some right to become Best's carrier, without Best's consent, the Court should find that the FCC waiver which MetTel sought and obtained provided Best with the right to change carriers.  *See* Exhs. 18 and 19.

Under applicable state and federal law (discussed above), a telecommunications carrier, such as MetTel, is prohibited from providing service to a customer (such as Best) without that customer's prior authorization.

Aware of this requirement, MetTel filed a petition with the FCC on April 4, 2001 seeking a waiver of the advance authorization requirement.

In its petition, MetTel represented to the FCC that, as a condition of the waiver, it would send a letter to each NATELCO customer – before the closing date: (i) notifying them of the pending transfer of their telephone service to MetTel; (ii) assuring them that no charge or rate increase will be imposed as a result of the transaction; (iii) **advising them that they are free to change their local and intraLATA toll preferred carrier(s)**; and (iv) informing them that they may contact MetTel via a toll-free number with any questions regarding the pending transfer of their account to MetTel's customer base. Ex. 18  (Emphasis added).

MetTel's representation that Natelco's customers would be "free to change their...carrier(s)" is consistent with the regulatory scheme promulgated by the FCC and the New York Public Service Commission which enforces a customers' right not to have an unauthorized carrier provide service to them. *See e.g.*, 47 CFR 64.1120, which prohibits a telecommunications carrier, such as MetTel, from becoming a customer's carrier without prior consent. Indeed, in granting the waiver petition, the FCC noted that:

> According to the Waiver Petition, MetTel will undertake a two-step process to notify the affected customers of the transfer. The first notification letter will inform the affected customers of the proposed transfer to MetTel and assure them that they will receive the same features, services, and rates that NATELCO currently provides. **This notification letter will also advise the affected customers that they may select a different preferred carrier, should they desire to do so.**

(Emphasis added).  The FCC also said that "[t]he grant of this waiver is conditioned upon the provision of customer notification and the handling of complaints, as described above and further detailed in the Waiver Petition." (As stated above, the "Waiver Petition" represented that

25

MetTel would advise Natelco's customers that they were "free to change their local and intraLATA toll preferred carrier(s)").

In sum, in order to obtain a waiver of the requirement that it obtain pre-transfer authorization, MetTel agreed that it would preserve Natelco's customers right to "select a different preferred carrier." MetTel was not privileged to ignore the representations it made to the FCC and it was not privileged to ignore the terms on which the waiver was granted to it. Accordingly, as MetTel represented to the FCC, and in accord with the FCC's waiver, Best had the right to leave MetTel without breaching its contract with NATelCo and Best's exercise of this right did not constitute a breach of the Natelco Agreement.

**D.    MetTel Waived Any Right To Rely On The FCC Waiver Because It Failed To Comply With The Conditions On Which The Waiver Was Granted**

Clearly aware that it was required to obtain *prior* authorization to become a customer's carrier, on April 4, 2001 MetTel filed an emergency petition with the FCC seeking a waiver of this requirement. As shown above, MetTel made certain representations to the FCC which it failed to comply with. Because customer consent was a predicate to MetTel ability to obtain rights under the Natelco Agreement, and MetTel failed to comply with the waiver it sought and obtained which would have excused such obligation, the bankruptcy court should have found that MetTel was not entitled to enforce the Natelco Agreement.

As set forth above, MetTel represented to the FCC that it would send a letter to each NATELCO customer before the closing date, among other things, notifying them of the pending transfer of their telephone service to MetTel and providing them with certain information. Exh. 18. And the Order issued by the FCC specifically stated that "The grant of this waiver is conditioned upon the provision of customer notification and handling of complaints, as described

26

above and further detailed in the Waiver Petition." Exh. 19 at ¶ 9.

There is no dispute that MetTel failed to offer any competent evidence at trial that it issued the first letter to Best. Indeed, the bankruptcy court found that MetTel sent only the second letter, not the first. Opinion, at p. 47. Because MetTel did not comply with the FCC waiver it cannot rely on that waiver to excuse it obligation to obtain Best's consent before it started to provide telecommunications services to Best.

**III**

**THE AWARD OF LOST
PROFITS WAS ERRONEOUS**

If the Court determines that MetTel had any rights under the Natelco Agreement, and that Best is the party which breached the agreement, it nonetheless should find that the award of lost profits to MetTel was erroneous.

**A.      Lost Profits Under The Natelco Agreement
          Were Not Within The Contemplation Of The Parties**

In order to recover lost profits, MetTel was required to show that liability for lost profits was within the contemplation of the parties at the Natelco Agreement was executed. *Travelers Int'l A.G v. Trans World Airlines*, 41 F.3d 1570, 1577 (2d Cir. 1994). The bankruptcy court erred when it held that lost profits were within the contemplation of the parties.

MetTel did not offer any testimony as to what Natelco contemplated when it signed the Natelco Agreement. Best, however, offered testimony that it did not contemplate that Natelco could assert a claim for lost profits. Thus, Michael Chaite, Best's President, testified that, at the time the Natelco Agreement was executed, Best was under threat from the City of New York that its PPTs would be removed. Best did not intend to put itself in the position where it could be

liable to pay Natelco for services it could not use because its PPTs had been removed by New York City. 12/13 Tr. at p. 32-34.

Further, the Natelco Agreement does not contain any provision requiring Best to obtain a minimum amount of "usage" from Natelco. Mr. Chaite testified that, at the time Best executed the Natelco Agreement, Best could have routed outgoing calls through a different carrier and, thus, would not have paid Natelco any money for "usage." 12/13 Tr. at p. 75-76. Accordingly, Best could not have contemplated that it could be liable for lost profits calculated based on "usage" and MetTel did not offer any evidence to the contrary.

Despite Best's testimony, and despite the fact that MetTel offered no testimony, MetTel and the bankruptcy court found that the language of the Natelco Agreement demonstrated that lost profits were within the parties' contemplation. This was error.

The bankruptcy court's conclusion was based almost entirely on the fact that the Natelco Agreement "limited Natelco's liability for 'lost revenues or profits' to those arising from gross negligence and willful misconduct" but did not "insulate[] Best from liability for lost profits...." Opinion, p. 18. This, however, is exactly the obverse of the conclusion the court should have reached.

First, the Natelco Agreement did not say that the parties contemplated lost profits. To the contrary, the agreement limited Natelco's liability for lost profits "even if Natelco has notice of the possibility of such damages." This phraseology indicates that the provision is mere boilerplate, is not specific to the contract between Natelco and Best, and actually precludes a finding that Natelco *had* notice of the possibility of damages for lost profits. Since the issue of lost profits was not peculiar to this agreement, the boilerplate language does not support a finding

that the parties contemplated that Best could be held liable for lost profits.

Second, the agreement demonstrates that Natelco was aware of claims for lost profits but Natelco did *not* include any affirmative language making Best liable for lost profits or otherwise demonstrating that the parties contemplated that an award of lost profits could be made in the event of a breach of the agreement.

Third, the Natelco Agreement did not contain any minimum usage requirements or otherwise obligate Best to pay Natelco any specific dollar amount (other than the obligation to obtain dial tone service from Natelco for the PPTs identified on the exhibit attached to the agreement). Best, thus, could not have foreseen, or contemplated, a claim for lost profits, let alone a claim for hundreds of thousands of dollars based on "usage."

The bankruptcy court's other justification for its conclusion – that the agreement had a one year term – is overly broad. The mere fact that an agreement is to last for a specified term does not demonstrate – without more – that the parties contemplated an award of lost profits in the event of early termination.

**B.     Natelco Was Not Ready, Willing and Able To Provide Service To Best**
        **At the Time Of The Alleged Breach, And MetTel Did Not Have The Right To Do So**

An element of a case seeking to recover lost profits is proof that the party was ready, willing and able to perform under the contract. Here, since MetTel was suing as Natelco's assignee, it was MetTel's burden to prove that Natelco was able to perform under the Natelco Agreement at the time of the alleged breach. *Penthouse International, Ltd v Dominion Savings and Loan Assn* , 855 F.2d 963, 979 (2d Cir. 1988).

There was no dispute at trial that Natelco was unable to provide service to Best, or any other customer, after April 30, 2001. 12/4 Tr. at 32-33; Exh. 15 at p. 34, 35. The question, thus,

is whether MetTel had the right to provide service to Best -- in Natelco's place and stead -- on May 15, 2001.

The clear answer to this question is that MetTel did not have such a right. As discussed above, the Natelco Agreement was not assigned to MetTel (if at all) until May 17, 2001, when the Sale Order was entered. Further, MetTel did not obtain PSC approval to provide service to Natelco's customers until May 23, 2001. This should have put an end to MetTel's claim. If Natelco was not ready, willing and able to perform on the date of the alleged breach and MetTel did not have the right to do so on its behalf. Accordingly, MetTel, as Natelco's assignee, could not recover for breach of contract.

Because MetTel was unable to support an element of its case, the bankruptcy court erred when it awarded MetTel lost profits.

C.   **The Bankruptcy Court Erred When It Based The Award On Proof Of Usage Under A Prior Agreement Between Best and MetTel, Not On The Actual Usage Under The Natelco Agreement**

MetTel was suing as Natelco's assignee. Accordingly, MetTel was required to demonstrate the profits allegedly lost under the Natelco Agreement.

MetTel's lost profits claim was based on two components: (a) dial tone service (also referred to as "line charges"); and (b) usage. See Exh. 2 at Met 05 (distinguishing between "line charges" which are the basic charge for dial tone service and day, evening, night and regional charges, which are based on actual usage by the public of Best's PPTs). While dial tone service was a fixed cost for each PPT, usage varied from phone to phone, day to day, and month to month.

Best and Natelco operated under the Natelco agreement for over 4 months (the Natelco

Contract is dated December 8, 2000 and continued through, at least, April, 2001). There was, thus, a substantial "track record" of the usage for each of Best's PPTs *under the Natelco Agreement*. For some reason which MetTel never explained, MetTel ignored the documents which reflected Best's actual usage under the Natelco Agreement and, instead, based its proof of damages on usage levels which MetTel provided under a prior, unrelated contract with Best which ended some five months before the lost profits period at issue here. 12/4 Tr. at p. 65-66. This was grossly improper in any instance and was even more improper here because MetTel had in its possession – but chose not to use – the actual bills Natelco rendered to Best under the Natelco Agreement. 12/4 Tr. at 68.

The law is clear that any award for an alleged breach of contract – including lost profits – must be limited to that amount necessary to "put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 420, 357 N.Y.S.2d 857, 860 (1974)(*quoting* 5 Corbin, Contracts, § 1002, pp. 31-32; 11 Williston Contracts (3d ed). § 1338, p. 198). In *Freund*, the Court continued that "it is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed." 34 N.Y.2d at 421, 357 N.Y.S.2d 860.

It is axiomatic that Natelco could not have recovered lost profits from Best based on Best's prior experience with MetTel (especially where, as here, there was a track record with Natelco) because that could over-compensate Natelco for the alleged breach. Since MetTel, as assignee, was "standing in Natelco's shoes" it could not do so either.

31

Best submits that MetTel did not rely on the actual Natelco usage because that would have resulted in a lower revenue number. Whether that was because of the increased use of cellular telephones, changes in the calling habits of the public customers who used Best's PPTs, or any one of numerous other potential possibilities which existed in 2001 but did not exist in 2000, is irrelevant. The fact is that MetTel had the ability to proffer evidence of usage during a substantial term of the Natelco Agreement (over 4 out of 12 months) – but it did not do so.

MetTel's failure to use the Natelco bills which would have demonstrated the actual usage during the term of the Natelco Agreement should have compelled the bankruptcy court to deny the claim for lost profits. The failure to do so was error.

The lost profits award was $238,082.43. Of this amount, $184,561.14 was awarded based on lost profits for usage.[9] Accordingly, the award should be reduced by $184,561.14.

## D.   The Bankruptcy Court Erred When It Allowed MetTel To Calculate Lost Profits Based On Its Expenses, Not Natelco's

The Natelco Agreement was between Best and Natelco. Even assuming that the agreement was properly assigned to MetTel, this did not mean that Best should be held liable based on MetTel's cost to provide service. Stated differently, Best could not have contemplated, when it executed the Natelco Agreement, that it would be liable for lost profits (if at all) based on a different entities' cost to provide service.

MetTel was obligated to demonstrate what it would have cost Natelco to provide service under the Natelco Agreement. Because MetTel did not offer any proof on this point, the bankruptcy court should have denied MetTel's claim for lost profits.

---

[9]     According to MetTel's calculations, it was deprived of $280,380.34 in revenues based on usage and its costs for usage would have been $95,819.20, leaving lost "profits" of $184,561.14.

E.   **The Bankruptcy Court Erred When It Included In
     MetTel's Lost Profits The FCC Line Charge Of $8.08**

One item of revenue which MetTel used to calculate the lost revenue portion of its

alleged lost profits was an FCC Line Charge of $8.08 per line per month.  *See* Exhibit 2 at MET

03.  This was error because this charge should not have been a component of revenue used to

calculate MetTel's lost profits under the Natelco Agreement.

The Natelco Agreement stated that "[Best's] total price for Services will the [sic] sum of

1) the Discounted Price, including any Early Payment Discount earned plus 2) all applicable

taxes and surcharges."  The agreement does not identify the FCC Line Charge as a "surcharge"

and it does not otherwise authorize Natelco to collect this charges from Best.

The bankruptcy court erred when it concluded that the FCC Line Charge constituted a

"surcharge" within the meaning of the Natelco Agreement because the agreement does not

specifically say that it is and because MetTel did not call any witness from Natelco to testify as to

the scope of the term "surcharge" as used in the Natelco Agreement.  Stated differently, there

was no testimony offered by any witness with knowledge that the Natelco Agreement imposed on

Best the obligation to pay the $8.08 FCC Line charge.

The bankruptcy court also erred when it found that "Natelco billed Best for the FCC line

charge" because there was not adequate support in the record for this conclusion.  Opinion, p. 35.

Indeed, while MetTel had copies of all of the bills Natelco rendered to Best during the term of

the Natelco Agreement (four months worth), MetTel offered into evidence just a few pages of

one of the bills (Ex. 2 at MET 17-21).  And these documents concerned just 16 out of Best's 964

PPTs.  This scant evidence does not support the bankruptcy court's conclusion that Natelco

billed Best for the FCC Line Charge for each and every one of Best's 964 PPTs.

33

The bankruptcy court awarded MetTel a total of $238,082.43 in lost profits. Of this amount, $166,579.20 was for "Estimated Line Charges." *See* Exh. 2 at MET 03 and 05. Of that amount, $62,312.96 was for eight months worth of FCC Line Charges on 964 lines ($8.08 x 964 x 8). *Id.* Accordingly, when the alleged lost revenues on account of the FCC Line charges are deducted, the lost profits award would have been $175,769.47.

## IV

## EVEN IF THE NATELCO AGREEMENT WERE PROPERLY ASSIGNED, BEST HAD THE RIGHT TO TERMINATE THE AGREEMENT BECAUSE THERE WAS A MATERIAL CHANGE

The Natelco Agreement provided, at ¶ 10, that [e]ither party may terminate this agreement if the **terms** or rates for services under this Agreement are materially and adversely affected by a final, non-appealable order of a judicial or regulatory body or Incumbent Local Exchange Carrier." Exh. 11. This provision clearly was designed to allow Best to cancel the Natelco Agreement in the event that changes were imposed on Best (or Natelco) by external forces which materially altered the parties' agreement. Because this provision was part of the Natelco Agreement, MetTel, as the purported assignee, took its rights subject to this provision.

MetTel was, and only could, provide service to Best under *its* (not Natelco's) tariff because MetTel did not adopt Natelco's tariff. MetTel's tariff, however, differed materially from Natelco's. Notably, the Natelco tariff exonerated Natelco of liability for service-related errors, interruptions and delays caused by ordinary negligence, permitting such claims to be asserted if Natelco acted with "gross negligence and/or willful misconduct." The MetTel tariff, on the other hand, exonerated MetTel from liability for "any special, consequential, exemplary or punitive damages...whether or not caused by the intentional acts or omissions or negligence of the

34

Company's employees or agents." This was not minor change. MetTel had, in the past, caused Best to suffer substantial damage through wrongful conduct with respect to service MetTel was providing to Best. The change in exculpation was a material change. As a result, as a matter of law, Best had the right to terminate the Natelco Agreement.

In ruling that this change did not permit Best to terminate the Natelco Agreement, the bankruptcy court first speculated that MetTel could provide service to Best under Natelco's tariff, or that MetTel's tariff would have been deemed amended to confirm to Natelco's tariff. The court then stated that, even if a change had been wrought, the change in limitation on liability "did not materially and adversely affect the 'terms or rates of service.'" Opinion, p. 22. This conclusion does not make sense. The "terms" of service are those contained in the agreement and incorporated therein, such as the terms of Natelco's tariff. The purported assignment of the Natelco Agreement clearly changed the "terms" under which service was to be provided.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the judgment entered in the bankruptcy court be vacated in its entirety or modified as set forth above.

Dated: Garden City, New York
　　　October 17, 2008

　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　DAVID BOLTON, P.C.

　　　　　　　　　　　　　　By:＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　David Bolton (DB 3826)
　　　　　　　　　　　　　　　666 Old Country Road, Suite 509
　　　　　　　　　　　　　　　Garden City, New York 11530
　　　　　　　　　　　　　　　(516) 222-0600

　　　　　　　　　　　　　　Appellate Counsel to Best Payphones, Inc.