UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the matter of

BEST PAYPHONES, INC.,

                             Debtor.

BEST PAYPHONES, INC.,

                          Appellant,

        -against-

MANHATTAN
TELECOMMUNICATIONS CORP. d/b/a
METTEL,

                        Appellee.

**MEMORANDUM OPINION
AND ORDER**

08 Civ. 07339 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        On May 17, 2007, the Bankruptcy Court issued a judgment against

Appellant Best Payphones, Inc. ("Best") awarding Appellee Manhattan

Telecommunications Corp. ("MetTel") $238,082.43 plus interest.  ("5/17/07 Written

Order")  Pending before the Court is Best's appeal from the Bankruptcy Court's

judgment.  For the reasons stated below, the appeal is denied.

## BACKGROUND

I.    FACTS[1]

Best installed and operated pay telephones in Manhattan, the Bronx, and Brooklyn, and contracted with other entities, known as competitive local exchange carriers ("CLECs"), to provide dial-tone service for its pay telephones.  (5/8/07 Op. at 2) Best entered into a service contract with MetTel on September 24, 1999 (the "1999 MetTel Contract") under which MetTel was to provide dial-tone service for all of Best's pay telephones.  On December 8, 2000, while the 1999 MetTel Contract was in effect, Best entered into a new agreement with Natelco (the "Natelco Agreement") and began using Natelco as its service provider.  (Id. at 2-3)  MetTel sued Best for unpaid fees under the 1999 MetTel Contract and obtained two judgments against Best totaling approximately $210,000.[2]  (Id. at 3)

Natelco began providing service for Best's pay phones on January 31, 2001.  (Id. at 3)  Shortly thereafter, on February 23, 2001, Natelco filed a petition for relief under Chapter 11 of the Bankruptcy Code.  (Id.)  MetTel agreed to purchase Natelco's assets, including its service contracts and accounts receivable, on April 4, 2001. (Id. at 4)

Best received notice of the proposed sale to MetTel and filed an objection to the sale.  (Id.)  Best acknowledged that its service contract with Natelco was an

_____

[1]  Unless otherwise noted, the facts discussed in this opinion are drawn from the Bankruptcy Court's May 8, 2007 Post-Trial Findings of Fact and Conclusions of Law ("5/8/07 Op.") and are not in dispute.

[2]  Best had a pattern and practice of running up substantial unpaid bills with service providers and then switching providers.  (5/8/07 Op. at 2-3; Tr. 12/13/2006 Hearing at 22-27)

executory contract within the meaning of Bankruptcy Code § 365, but objected to the sale

on the ground that MetTel could not fully perform the contract.  (Id.)  The bankruptcy

court overruled the objection and – because of Natelco's dire financial condition and the

need to avoid a break in service – approved the sale from the bench on April 25, 2001.

(Id.)  Because Natelco could not continue to operate as of April 25, 2001, the bankruptcy

court authorized MetTel to begin providing service to Natelco's customers immediately.

(Id. at 5)  The bankruptcy court entered a formal order assigning Natelco's service

contracts to MetTel on May 16, 2001.  (Id. at 5)

On May 8, 2001, MetTel sent Best the following "Notice of

Disconnection":

> This is a final disconnect notice.  Payment of $267,328.61
> is required by May 18, 2001 to avoid the suspension of
> your outgoing service on the following business day.  Ten
> days later your service will be disconnected.
>
> The following represents a breakdown of the amount due
> MetTel:

| | |
|---|---|
| Judgment of Past Due Amounts | $185,205.68 |
| March 1, 2001 Invoice (Natelco) | 41,703.01 |
| April 1, 2001 Invoice (Natelco) | 40,419.92 |
| TOTAL | $267,328.61 |

> The above total does not include any legal fees or late fees
> that are associated with the judgment against Best
> Payphones.  This will be determined at a later date.
>
> If your service is suspended, you will have to pay $40.00
> per line to have service restored, and a deposit of your last
> two (2) months invoices will be required.  To restore your
> service promptly, payment must be made by certified check
> or wire transfer.  Payment by personal check will delay the
> restoration of service until the date the check clears.
>
> Unless the full amount is paid prior to disconnection of
> your service, we will have no choice but to cancel your
> account.  To reestablish service, you will have to pay your

full account balance, a new connection charge, and possibly
a deposit.

You can avoid these inconveniences by paying promptly.

If you have any questions about your bill please call me at
(212) 607-2166.  If you have already sent full payment,
please confirm its receipt with METTEL to avoid any
possible interruption in service.

METTEL

(Pltf. Ex. 23)

Best responded by entering into a service agreement with yet another

provider, BridgeCom, on May 15, 2001.  (Id. at 8)  Although Best later contended that

MetTel's "Notice of Disconnection" constituted a breach of the Natelco Agreement, at

the time Best did not give MetTel notice of breach or an opportunity to cure, despite the

following notice and cure provision in the Natelco Agreement:  "[Best] may terminate

this Agreement for any material breach by [the provider] of its obligations under this

Agreement, unless [the provider] cures such breach within ten (10) business days after

the date written Notice is given to [the provider]."  (Pltf. Ex.11 ¶ 7; Op. at 11)

MetTel filed a breach of contract suit against Best on August 15, 2001.

(5/8/07 Op. at 8)  That action was stayed when Best initiated Chapter 11 bankruptcy

proceedings on October 23, 2001.  (Id.)  MetTel then filed a proof of claim in the

bankruptcy proceedings.  (Id. at 8-9)

## II.    The Bankruptcy Court's Decision

After a three-day bench trial, the bankruptcy court found that MetTel had

proven that Best breached the Natelco Agreement and that MetTel was entitled to

damages representing lost profits in the amount of $238,082.43 plus statutory interest.

(Id. at 1-2)  In so holding, the bankruptcy court found that MetTel had breached the

4

Natelco Agreement by serving a notice of disconnection conditioned on payment of the judgment arising from the unrelated 1999 MetTel Contract.  (Id. at 10-11)  The court further found, however, that Best was obligated to notify MetTel of that breach and to provide MetTel with an opportunity to cure before it terminated the Natelco Agreement. It is undisputed that Best failed to give such notice to MetTel before entering into the agreement with BridgeCom on May 15, 2001.  (Id. at 11-15)  Accordingly, the court concluded that Best breached the Natelco Agreement when it terminated that agreement on May 15, 2001.

The court rejected Best's defenses to liability, finding that MetTel had not unequivocally repudiated the Natelco Agreement, and that accordingly Best was not excused from complying with the notice and opportunity to cure provisions set forth in the Natelco Agreement.  (Id. at 11-13)  The court also concluded that language differences between the Natelco Tariff and the MetTel Tariff were not material, and that accordingly Best had no right to terminate the Natelco Agreement on this ground.  (Id. at 21)  Best's anti-slamming arguments were likewise rejected.  The court held that neither New York anti-slamming laws nor FCC waivers granted to Natelco invalidated Best's service agreement with MetTel.  The court further held that even if these provisions could be read as requiring notice and consent to assignment, the Bankruptcy Code invalidated any provisions limiting assignment.  (Id. at 25)

The court awarded lost profits to MetTel based on the difference between the gross income MetTel lost when Best terminated the Natelco Agreement and the costs MetTel saved as a result of the breach.  (Id. at 32)  The court relied on data of Best's usage levels in 2000 under the 1999 MetTel Contract.  This usage data was applied to the

rates specified in the Natelco Agreement and Verizon's wholesale tariff.  (Id. at 32-33)
The court included an FCC line charge for each line used by Best in these calculations,
finding that this line charge was a surcharge commonly billed to CLECs.  (Id. at 35)

## III.   Issues Presented on Appeal

On appeal, Best argues that:

(1) MetTel repudiated the Natelco Agreement, and that this repudiation
excused Best's obligation to comply with the notice and cure provisions of the Natelco
Agreement (Best Br. at 1);

(2) even if Best was required to comply with the notice and cure
provisions, Best's obligation to provide 10 business days notice to MetTel of the breach
was excused in light of MetTel's demand that Best make payment within 10 calendar
days or suffer a service suspension (id.);

(3) Best had no obligation to accept MetTel as its service provider (id.);

(4) the bankruptcy court erred in awarding MetTel lost profits calculated
on the basis of usage under the 1999 MetTel Contract, rather than on the basis of usage
under the Natelco Agreement (id. at 1-2); and

(5) the bankruptcy court erred in including in the lost profits award an
FCC line charge of $8.08 per line.  (Id. at 2)

## DISCUSSION

## I.   STANDARDS OF REVIEW

Under Rule 8013 of the Federal Rules of Bankruptcy Procedure, this Court
"may affirm, modify, or reverse [the] bankruptcy judge's judgment, order, or decree or
remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  Rule 8013
further provides that the bankruptcy judge's "[f]indings of fact, whether based on oral or

6

documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Id.  A finding of fact is clearly erroneous where

> "although there is evidence to support it, the . . . court on the entire record is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).  While the trial court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden.  See Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2585 (1995).  If two views of evidence are possible, the trial judge's choice between them cannot be clearly erroneous.  See Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L. Ed.2d 518 (1985).  "To be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must . . . strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish."  Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228 (7th Cir.), cert. denied, 493 U.S. 847, 110 S.Ct. 141, 107 L. Ed.2d 100 (1989).

H & C Dev. Group, Inc. v. Miner (In re Gregory & Dawn Miner), 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999).

A bankruptcy judge's conclusions of law are reviewed de novo.  Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.), 493 F.3d 82, 85 (2d Cir. 2007).  When reviewing an issue de novo, the Court "decide[s] the issue as if no decision had previously been rendered."  In re Miner, 229 B.R. at 565.

Mixed questions of law and fact are reviewed "de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual."  Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300, 316 n.11 (2d Cir. 2009), vacated sub nom. Am.

7

Express Co. v. Italian Colors Rest., No. 08-1473, – S.Ct. –, 2010 WL 1740528 (May 3, 2010); Bay Harbor Mgmt., L.C. v. Lehman Bros. Holdings, Inc.(In re Lehman Bros. Holdings, Inc.), 415 B.R. 77, 83 (S.D.N.Y. 2009) (same).

## II.    THE BANKRUPTCY COURT WAS NOT CLEARLY ERRONEOUS IN HOLDING THAT METTEL HAD NOT REPUDIATED THE NATELCO AGREEMENT

The bankruptcy court held that MetTel breached the Natelco Agreement by demanding payment of the unrelated judgment in the Notice of Disconnection.[3] (5/8/07 Op. at 10)  It further held, however, that MetTel's breach was not an unequivocal repudiation of the Natelco Agreement,[4] and that accordingly MetTel's breach did not excuse Best from compliance with the notice and cure provisions of the Natelco Agreement.  (Id. at 11-14)  Best claims that this ruling was erroneous.  (Best Br. at 10-13)

Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty."  Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2002) (citing Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002); Norcon Power Partners v.

_____

[3]  MetTel does not dispute that it breached the Natelco Agreement when it demanded payment of the judgment in the Notice of Disconnection.  (MetTel Br. at 13)

[4]  Although Best argues that the bankruptcy court found that MetTel had unequivocally repudiated the Natelco Agreement (Best Br. at 10), this argument is meritless.  The bankruptcy court expressly found that "MetTel did not unequivocally repudiate any further performance."  (5/8/07 Op. at 13)

Best also argues that the bankruptcy court improperly drew a distinction between "anticipatory breach" and "repudiation."  (Best Reply Br. at 2).  The bankruptcy court made no such distinction.  Instead, the court correctly addressed the issue of whether MetTel's breach was an unequivocal repudiation of the Natelco Agreement that excused Best's failure to comply with the notice and opportunity to cure provisions.  (5/8/07 Op. at 13)  The court concluded that MetTel had not unequivocally repudiated the Natelco Agreement.  (Id.)

Niagara Mohawk Power Corp, 705 N.E.2d 656, 659 (N.Y. 1998)).  Repudiation "can consist of an attempt to advance an unwarranted interpretation of the contract or an indication that the renouncing party will perform only if certain 'extracontractual' conditions are satisfied." Palazzetti Imp./Exp., Inc. v. Morson, No. 98 Civ. 722 (FM), 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001) (citing SPI Commc'ns, Inc. v. WTZA-TV Assocs. Ltd. P'ship, 229 A.D.2d 644, 645 (3d Dep't 1996)).  Once a party anticipatorily repudiates, the other party is excused from complying with any conditions precedent contained in the contract, including the obligation to give notice of breach and an opportunity to cure.  See Vill. Constr. Co., Inc. v. CED Constr. Partners, Ltd., No. 03 Civ. 799 (CLB), 2004 WL 4975479, at *3 (S.D.N.Y. Jul. 8, 2004) ("Under New York law, a terminating party's failure to afford contractually-required notice is excusable as futile where the nonperforming party . . . expressly repudiates the parties' contract"); see also Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 728 (2d Cir. 1992) (recognizing that a failure to provide notice and an opportunity to cure may be excused where "the repudiating party expressly disavowed any further duties under the contract at issue, in effect declaring the contract at an end"); Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001 (NRB), 2000 WL 1006236, at *4 (S.D.N.Y. July 20, 2000) (same).[5]

In order to excuse performance, however, "[t]he announcement of intention not to perform by the repudiating party must be 'positive and unequivocal.'" About.com, Inc. v. TargetFirst, Inc., No. 01 Civ. 01665 (GBD), 2003 WL 942134, at *4 (S.D.N.Y. Mar. 10, 2003) (quoting Tenavision, Inc. v. Neuman, 379 N.E.2d 1166, 1168

---

[5]  Neither party contests that New York law governs the Natelco Agreement.  (Natelco Agreement ¶ 19)

(N.Y. 1978)); see also Higgins v. Cal. Prune & Apricot Growers, Inc., 16 F.2d 190, 193

(2d Cir. 1926) ("In order to warrant a finding of repudiation of the contract, the evidence

must disclose an absolute, definite, and unequivocal refusal to go on with the contract.")

(emphasis added); Tex. Trading & Milling Co. v. H.I.T. Corp., No. 84 Civ. 3776 (LLS),

1986 WL 9792, at *9 (S.D.N.Y. Sept. 3, 1986) ("If a party to a contract demands of the

other party a performance to which he has no right under the contract and states

definitively that, unless his demand is complied with, he will not render his promised

performance, an anticipatory repudiation has been committed.") (quoting Unique

Systems, Inc. v. Zotos Intern., Inc., 622 F.2d 373, 377 (8th Cir.1980) (emphasis added)));

11 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 1322

(3d ed. 1961 & Supp. 1995) ("[I]n order to give rise to an anticipatory breach of contract,

the refusal to perform must have been positive and unconditional.").

          Whether a particular communication or act constitutes repudiation of a

contract generally presents a question of fact.  Palmiero v. Spada Distrib. Co., 217 F.2d

561, 565 (2d Cir. 1954) (issue of repudiation raised a question of fact that should have

been left to the jury); Higgins, 16 F.2d at 192-93 (discussing repudiation as a question of

fact that requires interpretation of evidence at trial); O'Shanter Res. v. Niagara Mohawk

Power Corp., 915 F. Supp. 560, 564, 567 (W.D.N.Y. 1996) (noting that repudiation

generally presents a question of fact and denying summary judgment where defendant

offered plaintiff a buy-out and stated that if plaintiff did not accept the offer, he should

contact defendant "to initiate discussions regarding the implementation of a new

contract"); Key Gate Cmty. Assoc., Inc. v. Adelphia Commc'ns Corp.(In re Adelphia

Commc'ns Corp., No. 05-01133, 2006 WL 898047, at *6 (Bankr. S.D.N.Y. Mar. 31,

2006) (finding both "as a fact" and as a "mixed question of fact and law" that contract

was not unequivocally repudiated); <u>O'Conner v. Sleasman</u>, 14 A.D.3d 986, 987-88 (3d

Dep't 2005) (holding that repudiation is a "factual determination [that] is heavily

dependant upon a determination of whether 'a breaching party's words or deeds are

unequivocal'"); Arthur Rosett, <u>Partial, Qualified, and Equivocal Repudiation of Contract</u>,

81 Colum. L. Rev. 93, 103 (1981) ("[w]hether a particular event or communication

amounts to repudiation is often seen as a question of fact.").[6]

         In arguing that MetTel's breach was "unequivocal," Best cites the first

paragraph of the disconnect notice, which states:  "This is a final disconnect notice.

Payment of $267,328.61 is required by May 18, 2001 to avoid the suspension of your

outgoing service on the following business day.  Ten days later your service will be

disconnected."  (Pltf. Ex. 23).  (<u>See</u> Best Br. at 4, 10-13)  Best also cites the testimony of

its president, Michael Chaite, to the effect that in December 2000 – when MetTel was

Best's service provider under the 1999 MetTel Contract – MetTel threatened to suspend

Best's service unless it made certain payments by December 15, 2000, and then

suspended service prior to December 15.  (Best Br. at 5 (citing 12/13 Tr. at 50-51))

—————————————————

[6]  Best argues that the bankruptcy court's finding should be reviewed <u>de novo</u>, citing
<u>Assoc. Metals & Minerals Corp. v. S/S JASMINE</u>, 983 F.2d 410, 413 (2d Cir. 1993), and
<u>Travellers Int'l, A.G. v. Trans World Airlines, Inc.</u>, 41 F.3d 1570, 1575 (2d Cir. 1994).
(Best Reply Br. at 3)  The first case deals with interpretation of a charter party; while
interpretation of a contract is generally subject to <u>de novo</u> review, no contract is at issue
here.  The second case is inapposite because – while some mixed questions of fact and
law are reviewed <u>de novo</u> – the standard of review is determined by "whether the
question is predominantly legal or factual."  <u>In re Am. Express Merchants' Litig.</u>, 554
F.3d at 316 n.11.  As noted above, the question of whether a communication constitutes
repudiation generally presents a question of fact, and that is the case here.

In finding that MetTel's breach did not constitute unequivocal repudiation, the bankruptcy court relied on the following:  First, the court noted that the disconnect notice invited further dialogue with MetTel; it invited Best to call with "any questions about [its] bill," and provided a telephone number for that purpose.  (5/8/07 Op. at 11; Pltf. Ex. 23).  The disconnect notice "left open the prospect of continued service even after the disconnection."  (Id.)  In the event that Best had responded to MetTel's invitation to discuss the outstanding balance, Best could have insisted that it had no obligation under the Natelco Agreement to pay MetTel the outstanding judgment due MetTel in connection with the 1999 MetTel Contract.  (Id.)  In doing so, Best would have met its notice and opportunity to cure obligations under the Natelco Agreement.  Best made no such communication to MetTel, however, undoubtedly because it still would have remained liable for the $82,122.93 due under the Natelco Agreement.  (5/8/07 Op. at 11-12 (citing 12/4 Tr. at 59-60), and 14))  Finally, with respect to Chaite's testimony regarding the December 2000 disconnect notice, the court found that after Best complained about the notice, MetTel reversed the suspension order and restored Best's service.  The court noted that this history suggests that "MetTel would have cured its breach if Best had complained [in 2001]," rather than simply fleeing to BroadCom. (5/8/07 Op. at 15)

Best argues that MetTel's mere demand for payment of the unrelated judgment establishes unequivocal repudiation.  See, e.g., Best Br. 7, 8 ("Best had the right to accept MetTel's word that it would suspend service to Best's PPTs unless Best paid amounts which indisputably were not due under the Natelco Agreement. . . . Best was entitled to take MetTel at its word that it would disconnect Best's telephone service

unless it paid monies not due under the Natelco Agreement.")  "[A] demand for more

than the contract calls for is not in itself a repudiation[, however]."  O'Shanter, 915 F.

Supp. at 568; cf. UCC § 2-610, cmt. 2 ("a demand by one or both parties for more than

the contract calls for in the way of counter-performance is not itself a repudiation.").

Instead, the Second Circuit requires "an absolute, definite and unequivocal refusal to go

on with the contract."  Higgins, 16 F.2d at 193 (emphasis added).  Courts apply a

stringent standard in determining whether the test for repudiation is met, and have

generally required repeated insistence on extra-contractual terms; repeated, definite and

absolute expressions of an unwillingness to perform; use of language such as

"termination," which conveys finality; or conduct by the allegedly repudiating party that

has rendered performance impractical or impossible.[7]  All of the cases cited by Best in

which courts have found unequivocal repudiation have involved such "plus factors."

    For example, in REA Express, Inc. v. Interway Corp., 538 F.2d 953, 954-

55 (2d Cir. 1976) (emphasis added), the Second Circuit cited repeated insistence on

extra-contractual terms, noting that the repudiating party "never retreated from its

position that [extraneous] . . . 'conditions precedent' had to be complied with" throughout

the course of negotiations and litigation.  Likewise, in Record Club of America, Inc. v.

_____

[7] There are, of course, important policy reasons for a strict application of the repudiation
rule.  The "legal rules of repudiation should be structured – and interpreted – to
encourage the parties to resolve their dispute without judicial intervention.  A resolution
better in every way is reached when parties determine the consequences themselves
without going to court.  The right of an insecure party to demand assurances of
performance from the other and the right of a breaching party to offer timely cure of
previous failures of performance frequently defuse the dispute engendered by the
repudiation."  Rosett, 81 Colum. L. Rev. at 103.  Applying this reasoning here, if Best
had accepted MetTel's invitation to discuss the bill, and challenged MetTel's insistence
on payment of the judgment, the dispute between the parties – assuming their good faith
– might have been resolved without the involvement of the judicial system.

United Artists Records, Inc., 643 F. Supp. 925, 936 (S.D.N.Y. 1986)(emphasis added),

vacated on other grounds, 890 F.2d 1964 (2d Cir. 1989), the court based its finding of

repudiation on the repeated conduct and definitive language of the defendant, which had

orally stated that "the agreement 'was over,' and that the [defendant] 'had no contract'

with [plaintiff]," and then "reiterated" in three subsequent letters that "it was of the

opinion that the agreement had terminated."

Similarly, in Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.,

301 A.D.2d 70, 78 (1st Dep't 2002), the court found repudiation where plaintiff had

rendered its performance impossible by "secretly entering into an agreement with a third-

party distributor that gave the distributor complete control over the prices to be charged

for the product."  Likewise, in Pitcher v. Benderson-Wainberg Assoc. II, Ltd P'ship, 277

A.D.2d 586, 586-88 (3d Dep't 2000), the plaintiffs were found to have repudiated a

restaurant lease where they – after unsuccessfully requesting modification of the original

contract – (1) informed the landlord that their restaurant "must cease operations" by a

certain date; (2) closed the restaurant; and (3) sold "considerable equipment" by that date.

See also Bausch & Lomb Inc., 977 F.2d at 728 ("the repudiating party expressly

disavowed any further duties under the contract at issue, in effect declaring the contract at

an end"); Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1275

(7th Cir. 1996) (finding repudiation where defendant sent plaintiff a letter stating:  "Your

exercise [of the option agreement] is untimely and of no effect. . . . [O]ur mutual

obligations under the swap agreement have now been satisfied and the agreement has

been terminated." (emphasis added)); Tex. Trading & Milling Corp., 1986 WL 9792, at

*10 (finding repudiation by buyer in connection with contract for sale of goods where

14

buyer had sent three telexes insisting on terms not included in the parties' original

contract); Alpine Courts, Inc. v. Wiedermann, 34 A.D.2d 951, 951-53 (2d Dep't 1970)

(holding that defendant purchaser of a motel repudiated sale agreement when defendant

moved out of the motel, refused to co-sign checks then due to the employees, and ceased

all communications with the seller); Allbrand Disc. Liquors, Inc. v. Times Square Stores

Corp., 60 A.D.2d 568, 568 (2d Dep't 1977) (affirming the trial court's finding that the

"lessor anticipatorily breached its lease when it told the lessee that it 'could not live' with

the lease as drawn and would not allow the lessee to take possession without

renegotiation" (emphasis added)).[8]  None of these cases relied on by Best involve facts

comparable to those here.

-----

[8]  Palazzetti Imp./Exp., Inc., 2001 WL 1568317, also cited by Best (Best Br. at 9)
provides no support for Best's position.  In Palazzetti, plaintiff alleged that a letter in
which the defendant "expressed an intention not to perform further pursuant to the
License unless Palazzetti agreed to one of two 'options,' both of which were contrary to
the original License terms," id. at *9, constituted a repudiation.  On a motion for
judgment as a matter of law, the court found that the jury "could have concluded that the
letter was a mere bargaining ploy rather than an unequivocal renunciation of the License
because the letter contained language indicating that these were the options that [the
defendant] was putting forth 'at this time.'"  Id. (emphasis added).  The court noted,
conversely, that the jury could have concluded that defendant had no intention of
performing.  The jury resolved the factual issue of repudiation against the defendant, and
the court found no basis for disturbing that verdict.  Palazzetti merely confirms the
stringent nature of the test for repudiation, and while the jury in that case resolved this
issue against the alleged repudiating party, that provides no basis for this Court to find
that the bankruptcy court's contrary factual finding here was clearly erroneous.

The remaining cases cited by Best (Best Br. at 7-10) are either not factually analogous or
merely stand for the general rule, not disputed here, that one party's repudiation of a
contract may excuse the other party's performance.  See First Nat'l of Omaha v. Three
Dimension Sys. Prods., Inc., 289 F.3d 542, 545 n.2 (8th Cir. 2002) ("an anticipatory
breach or repudiation by one party excuses the other party from having to give notice and
an opportunity to cure"); Concorde Fin. Corp. v. Value Line, Inc., No. 03 Civ. 8020
(NRB), 2004 WL 1687205, at **3-4 (S.D.N.Y. July 28, 2004) (finding allegations
relating to anticipatory breach sufficient to survive motion to dismiss); About.com, Inc.,

While MetTel's disconnect notice threatened suspension of service if payment was not made, it also contemplated the continuation of service and invited Best – as the bankruptcy court found – to contact MetTel about the matter and provided a telephone number for that purpose.  An invitation to engage in a dialogue about the disconnect notice does not convey finality.  While Best contends that such a dialogue would have been futile, given Best's failure to make that call, there is no way to know.  Moreover, given the parties' history, including a prior incident in which MetTel reversed a suspension order, Best's assertion does not seem well founded.  In any event, as the U.S. Supreme Court stated long ago, a "'mere assertion that the party will be unable or will refuse to perform his contract is not sufficient [to establish repudiation].  It must be a distinct and absolute refusal to perform the promise. . . ."  Dingley v. Oler, 117 U.S. 490, 502-03 (1886) (quoting In re Smoot, 15 Wall. 36, 48 (1872)) (holding that statement that

---

2003 WL 942134, at **4-5 (stating general principles of law relating to repudiation, but deciding summary judgment motion on ground that there was a factual dispute as to whether a breach had occurred); Needham v. Candie's, Inc., No. 01 Civ. 7184 (LTS)(FM), 2002 WL 1896892, *4 (S.D.N.Y. Aug. 16, 2002) (repudiation excuses the other party from having to give notice and an opportunity to cure); Kurabu v. Pension Benefit Guar. Corp., No. 96 Civ. 4960 (BSJ), 1997 WL 759462, at *11 (S.D.N.Y. Dec. 10, 1997) ("a duty to provide notice and cure may be excused where futile, such as in the face of abandonment or repudiation"); Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 43 (1989) (stating, in discussing damages calculation, that "the doctrine [of anticipatory breach] relieves the nonrepudiating party of its obligation of future performance"); Created Gemstones, Inc. v. Union Carbide Corp., 47 N.Y.2d 250, 256 n.5 (1979) (stating general principle that "[i]f defendant did indeed refuse to perform unless plaintiff complied with a condition which went beyond the contract, then defendant's conduct would amount to a repudiation," and that "[i]n such a case, plaintiff would have been entitled to suspend its own performance without committing an independent breach of the contract"); SPI Commc'ns, Inc., 229 A.D.2d at 645 (affirming denial of motion to dismiss claim and stating that "[a]n anticipatory repudiation, entitling the nonrepudiating party to recover damages for a total breach and excusing it from further performance . . . can be grounded upon a finding that the other party . . . has communicated its intent to perform only upon the satisfaction of extracontractual conditions").

16

"[w]e cannot . . . comply with your request to deliver to you the ice claimed" was "very far from being a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time").  This Court cannot conclude that the bankruptcy judge was clearly erroneous in finding that this standard was not met here.[9]

## II. THE BANKRUPTCY COURT WAS NOT CLEARLY ERRONEOUS IN HOLDING THAT METTEL HAD NOT WAIVED ITS CONTRACTUAL RIGHT TO NOTICE OF BREACH AND AN OPPORTUNITY TO CURE

The bankruptcy court held that MetTel – in demanding that Best make payment within ten calendar days or face suspension – had not waived its right to notice of breach and an opportunity to cure.  Because under the Natelco Agreement MetTel had ten business days to cure, Best argues that MetTel's deadline forced it to make payment before MetTel's cure period expired.  In insisting that Best make payment in ten calendar days or face suspension, Best contends that MetTel waived its right to notice and an opportunity to cure.  (Best Br. at 13-15)  The bankruptcy court considered and rejected that argument.[10]  (5/8/07 Op. at 12-13)  Best's appeal of that determination fails for multiple reasons.

As an initial matter, MetTel was not contractually obligated to provide Best with ten business days' notice before suspending service for failure to pay invoiced amounts.  To the contrary, the Natelco Agreement provided that if Best did not pay an

---

[9]  The standard of review is not critical to this Court's determination.  Even under a de novo standard of review, this Court would have concluded that the disconnect notice was not sufficiently final, definitive, absolute and unequivocal so as to constitute repudiation, for the reasons discussed above.

[10]  The bankruptcy court's findings concerning waiver and futility are subject to the clearly erroneous standard of review.  See Kern Oil & Ref. Co. v. Tenneco Oil Co., 840 F.2d 730, 736 (9th Cir. 1988) ("The question of waiver of a contractual right is also a question of fact and subject to the clearly erroneous standard.").

invoiced amount, its service could be suspended on two business days' written notice.
(Pltf. Ex. 11 ¶ 5)  Accordingly, Best entered into a contract that gave it less time to cure a
default than MetTel had to cure its own breach.  Best cannot be heard to complain about a
business risk that it contracted for.

Secondly, Best has cited no case law in support of its argument, and the
case law addressing such circumstances refutes its position.  In Bausch & Lomb Inc., 977
F.2d at 725, 727, the Second Circuit rejected defendant's argument that it was excused
from giving thirty days notice of termination and an opportunity to cure because the
plaintiff's breach had occurred at a critical time in its business cycle.  Bausch & Lomb
makes clear that compliance with notice and opportunity to cure provisions is not
excused merely because, as here, compliance with those contractually agreed upon terms
exposes a party to business risk.

While courts excuse parties from providing notice and opportunity to cure
when the notice would be futile based on the "express[] disavow[ance]" of a repudiating
or abandoning party, Bausch & Lomb Inc., 977 F.2d at 728 ("once it becomes clear that
one party will not live up to the contract, the aggrieved party is relieved from the
performance of futile acts.")(citing Allbrand, 60 A.D.2d at 568), as discussed above,
MetTel neither unequivocally repudiated nor expressly abandoned its contractual duties.
Moreover, it is apparent – as the bankruptcy court found – that MetTel could have cured
its breach within the contractual cure period and that notice therefore was not futile.
(5/8/07 Op. at 12 (citing Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,
865 F.2d 513, 519 (2d Cir. 1989) (finding that notice would not have been futile based on
testimony that breaching party could have cured within the period required by the

contract))).  Upon notice from Best that it had breached the Natelco Agreement by insisting on payment of an unrelated judgment, MetTel could have immediately cured its breach by issuing a revised disconnect notice limited to the amounts Best owed under the Natelco Agreement.

In sum, Best has not established that MetTel waived its right to notice and an opportunity to cure by insisting on payment within ten calendar days, nor has it demonstrated that giving notice of breach to MetTel would have been futile.

## III.   METTEL WAS ENTITLED TO ENFORCE THE TERMS OF THE NATELCO AGREEMENT

Best asserts that MetTel had no rights under the Natelco Agreement as of May 8, 2001 – when it issued the disconnect notice to Best – because:  (1) the bankruptcy court's Sale Order was not entered on the court's docket until May 17, 2001; (2) Best had the right under New York law to reject MetTel as its service provider; and (3) Best had the right to choose a new carrier under the waiver MetTel received from the FCC or, in the alternative, Best had the right to choose a new carrier under federal law because MetTel failed to comply with the terms of the FCC's waiver.

### A.   Effective Date of Sale Order

Best did not argue below that the bankruptcy court's Sale Order was not effective at the time of the May 8, 2001 disconnect notice.  Because this issue was not raised below, it has been waived and will not be considered by this Court.[11]  Klein v.

_____

[11]  Best's argument that it raised this issue below is false.  In support of this claim, Best cites its Proposed Findings of Fact and Conclusions of Law ¶ 69.  (Best Reply Br. at 7) This paragraph does not address this issue.  Paragraph 69 merely states:  "The bankruptcy court approved the Asset Purchase Agreement, (Ex. 15), but it was by its terms subject to non-bankruptcy law. (Pltf. Ex. 32, ¶ 8)."

Civale & Trovato, Inc. (In re Lionel Corp.), 29 F.3d 88, 92 (2d Cir. 1994) (party waived argument by failing to present it to bankruptcy court or district court and no manifest injustice would result from waiver); Whittaker v. MCI, LLC (In re Worldcom, Inc.), No. 07 Civ. 3408 (DLC), 2007 WL 2682882, at *8 (S.D.N.Y. Sept. 14, 2007) (federal district court deciding bankruptcy appeal will not consider argument that was not raised adequately before bankruptcy court unless manifest injustice would result); Tese-Milner v. Brune (In re Red Dot Scenic, Inc.), 293 B.R. 116, 123 (S.D.N.Y. 2003) (finding argument waived because it had not been raised before bankruptcy court).

Universal Church v. Geltzer, 463 F.3d 218 (2d Cir. 2006), cited by Best, is not to the contrary.  That court cited both the "general rule that an appellate court will not consider an issue raised for the first time on appeal," and the narrow exception that "an appellate court has discretion to consider arguments not raised below 'to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding.'"  Id. at 228 (citations omitted)  The Geltzer court then applied the general rule and not the narrow exception "[b]ecause the [plaintiff] was not entitled to assume it would prevail on the aggregation issue in the bankruptcy court [and] it has no excuse for failing to raise the argument . . . in that court.  Thus, it was not an abuse of discretion for the district court to refuse to consider this defense on appeal."  Id. The narrow exception similarly is inapplicable here, because there is no evidence of manifest injustice to Best and Best has offered no excuse for failing to raise this argument during

20

the bankruptcy proceedings.[12]  Under these circumstances, this Court will not consider

Best's claim concerning the effective date of the Sale Order.

      **B.**      **Best's Claims Under New York Law and the FCC Waiver**

      During the bankruptcy court proceedings, Best never argued that its

consent to the Natelco sale was necessary under New York law and the FCC waiver

before the Natelco Agreement could be assigned to MetTel.  Indeed, Best explicitly

stated that it did "not object to the concept of the assumption of the [Natelco] contract."

(5/8/07 Op. at 26)  MetTel's sole objection below was that MetTel was not an appropriate

---

[12]  Even if Best had not waived this argument, it would be unavailing.  Courts have found oral orders in bankruptcy proceedings to be effective immediately where, as here, the parties had notice of the oral order and it was important that the order take effect immediately.  In <u>In re Nail</u>, 195 B.R. 922, 923, 924-25 (Bankr. N.D. Ala. 1996), for example, the bankruptcy court's oral order granting debtors' motion to reinstate their case was held to be effective immediately and instantly resurrected the automatic stay.  The court stated that "[c]ertain orders must be enforced when issued[,] [and] [t]he importance of such orders lies strictly in the order's ability to produce immediate results."  <u>Id.</u> at 932; <u>see also</u> <u>Saffady v. Dunn</u>, No. 07 Civ. 12347, 2009 WL 1868032, at *5 (E.D. Mich. Jun. 26, 2009) (holding that the parties were bound by oral order where "both the plaintiffs and defendants had knowledge of the order" (internal citation omitted)); <u>Dynamic Changes Hypnosis Ctr., Inc. v. PCH Holding, LLC</u>, 306 B.R. 800, 809 (Bankr. E.D. Va. 2004) (stating that an oral order rejecting a license agreement "was effective immediately" and noting that "appellant had actual knowledge of the court's" oral order); <u>In re Brown</u>, 290 B.R. 415, 421 (Bankr. M.D. Fla. 2003) (holding that the oral order was not effective until reduced to writing because the mortgagee had no knowledge of the oral decision, and if the mortgagee "had heard the Court's [oral] ruling," the "Court would [have] rule[d] differently).  <u>See also</u> <u>Noli v. Commissioner</u>, 860 F.2d 1521, 1525 (9th Cir.1988) (holding an oral order binding and effective despite the court's failure to enter it on the docket; <u>Viera v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)</u>, 372 B.R. 796, 802 n.2 (Bankr. D.S.C. 2007) (stating that an order granting relief from an automatic stay was effective upon the oral ruling).

<u>In re Rebeor</u>, 89 B.R. 314, 320 (Bankr. N.D.N.Y. 1988), relied on by Best, is not on point.  The issue in that case is when an order becomes final for purposes of appeal.

alternative provider because it could not provide adequate service.[13]  (5/8/07 Op. at 26

(citing Pltf. Ex. 14 ¶ 6))  Because the consent issue was not raised below, it has been

waived.

Even if Best had objected based on its lack of consent to the assignment,

MetTel argues that Section 365(f) of the Bankruptcy Code (11 U.S.C. § 365(f)) renders

invalid laws that prohibit or restrict the assignability of executory contracts such as the

Natelco Agreement.  Best does not address this argument.

Section 365(f) states in pertinent part:

> (1) Except as provided in subsection (c) of this section,
> notwithstanding a provision in an executory contract . . . of
> the debtor, or in applicable law, that prohibits, restricts, or
> conditions the assignment of such contract . . . the trustee
> may assign such contract or lease
> *       *       *       *
> (3) Notwithstanding a provision in an executory contract
> . . . of the debtor, or in applicable law that terminates or
> modifies, or permits a party other than the debtor to
> terminate or modify, such contract . . . or a right or
> obligation under such contract . . . on account of an
> assignment of such contract . . . such contract, lease, right,
> or obligation may not be terminated or modified under such
> provision because of the assumption or assignment of such
> contract or lease by the trustee.

11 U.S.C. § 365(f) (emphasis added).

Subsection (c) of Section 365 restricts assignment of executory contracts

where "applicable law excuses a party . . . to such contract . . . from accepting

performance from or rendering performance to an entity other than the debtor" where

"such party does not consent to such assumption or assignment."  11 U.S.C.

---

[13]  That issue is not raised in this appeal.

§ 365(c)(1)(A) and (B).  Best, however, has never argued that this provision applies, perhaps because it did not object to assignment below.

Having not addressed the bankruptcy court's ruling and MetTel's present argument that Section 365(f) invalidates laws that would have prohibited the assignment of the Natelco Agreement – particularly where a party has stated that it does not object to an assignment – Best has offered no basis on which this Court can conclude that the bankruptcy court committed error.[14]

## IV.   BEST HAD NO RIGHT TO TERMINATE THE NATELCO AGREEMENT BASED ON LANGUAGE DIFFERENCES BETWEEN THE NATELCO AND METTEL TARIFFS

Paragraph 10 of the Natelco Agreement states that "[e]ither party may terminate this agreement if the terms or rates for services under this agreement are materially and adversely altered by a final, non-appealable order of the judicial or regulatory body or Incumbent Local Exchange Carrier."  (Pltf. Ex. 11)  Best claims that when the Natelco Agreement was assigned to MetTel, Best became subject to the MetTel tariff, and that this change "materially and adversely" affected the terms of service.  (Best Br. at 34)  The Natelco tariff limits Natelco's liability for service-related errors, interruptions and delays to cases of "gross negligence and/or willful misconduct." (Natelco Tariff § 3.2.2)  MetTel's tariff states that MetTel "will not be liable for any special, consequential, exemplary or punitive damages . . . whether or not caused by the

---

[14]  Best also argues that the Sale Order required parties to "cooperate and act in accordance with applicable nonbankruptcy law (including all applicable tariffs) with respect to the migration of the Debtor's customers."  (Sale Order ¶ 8)  The bankruptcy court stated that "migration" refers to the physical transfer of customers from Natelco's to MetTel's lines and did not give Best any rights in contravention of Section 365(f). (5/8/07 Op. at 26-27, 27 n. 15)  Best has provided no basis for this Court to question the bankruptcy court's interpretation of its own order.

intentional acts or omissions or negligence of the Company's employees or agents."
(MetTel Tariff § 2.1.2(d))

In considering this issue, the bankruptcy court noted that there is a
substantial question whether the MetTel tariff supplants the Natelco tariff.  (5/8/07 Op. at
22)  The court's Sale Order approves the assumption and assignment of the Natelco
Agreement to MetTel.  Ordinarily, a party assuming an executory contract under such
circumstances would be bound by the terms of the contract assumed, and would not be
free to impose harsher terms.  (Id.)  The court went on to hold, however, that "even if"
the MetTel tariff supplants the Natelco tariff, "the MetTel Tariff's limitation on liability
did not materially and adversely affect the 'terms or rates for services' under the Natelco
Agreement," noting that MetTel continued to provide the same dial-tone services at the
same rate.  (Id.)

Best has failed to demonstrate that the bankruptcy court erred in holding
that the MetTel tariff's limitation on liability does not constitute a material, adverse
change in the terms or rates for services.  While Best cites language in the Natelco tariff
permitting claims based on gross negligence and willful misconduct, it does not respond
to MetTel's argument (MetTel Br. at 35) that the Natelco Agreement bars liability for
"any indirect, incidental, consequential or special damages (including, without limitation,
lost revenue or profits even if Natelco has notice of the possibility of such damages)" and
restricts "total, aggregate liability from any cause whatsoever" to "an amount equal to
sums paid by [the customer] for the services found to have been the cause of such
liability."  (Natelco Agreement ¶ 12)  Given these limitations, the bankruptcy court did

not err in determining that the MetTel tariff did not constitute a material, adverse change

to the terms or rates for services.

V.      **THE BANKRUPTCY COURT DID NOT**
        **ERR IN AWARDING LOST PROFITS**

        Best argues that the bankruptcy court's lost profits award is erroneous

because:  (1) the parties to the Natelco Agreement did not contemplate liability for lost

profits; (2) the award was calculated on the basis of Best's usage in 2000 under the 1999

MetTel Contract rather than on the basis of Best's usage for three months in 2001 under

the Natelco Agreement; and (3) FCC line charges were included as part of the award

even though – according to Best – it was not responsible for such charges under the

Natelco Agreement.[15]  The bankruptcy court's factual findings in connection with a

damage award are subject to the clearly erroneous standard.  See, e.g., In re Men's

Sportswear, Inc., 834 F.2d 1134, 1139 (2d Cir.1987) (reviewing lost profits award under

clearly erroneous standard).

      A.      **The Bankruptcy Court Did Not Err In Concluding that**
             **Lost Profits Were Within the Contemplation of the Parties**

        A party may recover lost profits where (1) "it [is] demonstrated with

certainty that such damages have been caused by the breach"; (2) "the alleged loss [is

established] with reasonable certainty"; and (3) "there [is] a showing that the particular

damages were fairly within the contemplation of the parties to the contract at the time it

---

[15] Best also contends that the lost profits award was erroneous because Natelco was not ready, willing, and able to provide service to Best at the time of the breach.  This argument is premised on Best's claim that there was no effective assignment until May 17, 2001, when the bankruptcy court's Sale Order was entered on the docket.  As noted above, Best has waived its arguments concerning the effective date of the April 25, 2001 Oral Sale Order by not presenting those arguments below.

was made." Travellers Int'l, A.G., 41 F.3d at 1577 (citing Kenford Co. v. County of Erie,

502 N.Y.S.2d 131, 132 (1986) (citations omitted)).  "In determining the reasonable

contemplation of the parties, the nature, purpose and particular circumstances of the

contract known by the parties should be considered, as well as 'what liability the

defendant fairly may be supposed to have assumed consciously, or to have warranted the

plaintiff reasonably to suppose that it assumed, when the contract was made.'"  Kenford

Co. v. County of Erie, 73 N.Y.2d 312, 320 (1989) (citing Globe Ref. Co. v Landa Cotton

Oil Co., 190 U.S. 540, 544 (1903)).

The bankruptcy court found that "logic and the contract's language"

indicate that liability for lost profits was within the contemplation of Natelco and Best.

(5/8/07 Op. at 18)  The contract provides that Best will pay a fee for a particular service.

The potential loss from breach was the loss of these fees, which "directly and predictably

flowed from Best's early termination."  (Id.)

Best argued below and argues here that it could not have contemplated lost

profits because: (1) the City of New York was threatening to shut it down at the time it

signed the Natelco Agreement; and (2) the Natelco Agreement does not contain minimal

usage requirements.  (Best Br. at 27-28)  As the bankruptcy court correctly pointed out,

however, even if Best had contemplated termination as a result of City action, that does

not mean that Best did not contemplate liability for lost profits resulting from a breach of

its own making.  (5/8/07 Op. at 18-19)  The bankruptcy court also noted that lost profits

are explicitly addressed in the Natelco Agreement.  Paragraph 12 of the Agreement states

that Natelco will not be liable for "lost revenues or profits"; the Natelco Agreement

contains no such limitation as to Best's liability.  (Id. at 29 (citing Pltf. Ex. 11, ¶ 12))

Given the term of the contract and that Natelco was providing a service to Best, the court found that it was "not inconceivable, irrational or illogical for the parties to have contemplated that Best assumed the risk of [the provider's] lost revenue stream – the object of the bargain – if Best wrongfully terminated the contract."  (Id. at 20)

If Best wanted to limit its liability for lost profits, it should have contracted for the same limitation that Natelco obtained.  There is no basis for disturbing the bankruptcy court's determination that it was within the parties' contemplation that Best would be liable for lost profits.

### B.     The Bankruptcy Court Did Not Err in Basing its Award on Prior Usage

The bankruptcy court's lost profits award was based on Best's usage during 2000, when MetTel provided service to Best pursuant to the 1999 MetTel Contract.  Best complains that the court should have relied on data from the three and a half months that Best received service from Natelco (late January to May 15, 2001), pursuant to the Natelco Agreement.  (Best Br. at 30-31)  Best supplied no usage data of its own, however, nor did it rebut MetTel's argument that it is not possible to reliably extrapolate from Best's three and a half months of usage between late January and mid-May 2001 what Best's usage would have been during the remaining eight months of the Natelco Agreement.

The Second Circuit has stated that where "a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty."  Indu Craft v. Bank of Baroda, 47 F.3d 490, 496 (2d Cir. 1995) (citing W.L. Hailey & Co. v. County of Niagara, 388 F.2d 746, 753 (2d Cir. 1967) (collecting New York cases)).  "New York courts do not require scientific rigor in the

27

calculation of damages.  When it is certain that damages have been caused by a breach of

contract, and the only uncertainty is as to their amount, there can rarely be any good

reason for refusing, on account of such uncertainty, any damages whatever for the breach.

A person violating his contract should not be permitted entirely to escape liability

because the amount of the damage which he had caused is uncertain." Lexington Prods.,

Ltd. v. B. D. Commc'ns, Inc., 677 F.2d 251, 253 (2d Cir. 1982).  While the standard is

flexible, the law, of course, "does not countenance the award of damages based on

guesswork and speculation." Kidder, Peabody & Co. v. IAG Int'l Acceptance Group

N.V., No. 94 Civ. 4725 (CSH), 1998 WL 888988, at *4 (S.D.N.Y. Dec. 21, 1998).

        Here, the bankruptcy court did not rely on "guesswork and speculation,"

but instead on billing records reflecting actual usage by Best over the preceding twelve-

month period.  Damage calculations based on similar sources have been approved by

other courts.  See Lexington Products, 677 F.2d at 254 ("Lexington has shown a track

record of Nenette sales before B.D.'s breach. . . . [T]he evidence supplies us with a basis

for multiple mathematical calculations capable of determining with some specificity the

financial repercussions of B.D.'s breach."); Travellers Int'l, 41 F.3d at 1579 ("an

established long-term course of dealings between the parties, demonstrable profit

margins, and a verifiable pricing structure permits lost profits to be calculated with

reasonable certainty"); Merlite Indus., Inc. v. Valassis Inserts, Inc., 12 F.3d 373, 376 (2d

Cir. 1993) ("Courts addressing the issue of damages based on loss of profits have

distinguished between established businesses and fledgling businesses, allowing the

claims of the former to be supported by evidence of past performance.  An established

business often is in a good position to offer evidence of past experience as a reasonable

basis from which a jury may determine lost profits with the requisite degree of certainty."
(citation omitted)).

    The bankruptcy court was entitled to credit the past usage data offered by
MetTel as being a "reasonably certain" indicator of MetTel's lost profits under the
Natelco Agreement, and Best has cited no evidence or law to the contrary.[16]

   **C.**  **The Bankruptcy Court Did Not Err in Including**
      **the FCC Line Charge in its Lost Profits Award**

    Before the bankruptcy court, Best argued that CLECs like MetTel are
legally barred from collecting line charges.  (5/8/07 Op. at 35-36)  Best does not renew
this argument on appeal, but instead contends that because the FCC line charge of $8.08
per line per month is not a "surcharge" as contemplated by the Natelco Agreement,
MetTel is not authorized to collect this charge from Best.  (See Best Br. at 33)

    In support of this argument, Best contends that "there was no testimony
offered by any witness with knowledge that the Natelco Agreement imposed on Best the
obligation to pay the $8.08 FCC Line charge."  (Best Br. at 33)  Best is wrong.

    As an initial matter, the Natelco Agreement states that Best's "total price
for Services will [be] the sum of 1) the Discounted Price, including any Early Payment
Discount earned plus 2) all applicable taxes and surcharges."  (Pltf. Ex. 11)  Moreover,

---

[16]  Best's argument that it "could not have contemplated, when it executed the Natelco
Agreement, that it would be liable for lost profits (if at all) based on a different entit[y's]
cost to provide service" (Best Br. at 32) is unavailing.  The historic usage data was based
on "unbundled network elements that made up the services [MetTel] provided to Best
and the amount it cost MetTel to purchase these services from Verizon under the
applicable Verizon tariffs and bills."  (5/8/07 Op. at 33).  These costs were not MetTel-
specific.  Indeed, Best's president and sole shareholder Michael Chaite testified that he
did not "believe" the assignment of the Natelco Agreement to MetTel had any affect on
the rates charged.  (12/14 Tr. at 27)

Andoni Economou, the Chief Operating Officer and former Executive Vice President of MetTel, testified based on his personal knowledge of the industry that "all local exchange carriers invoice an FCC charge," and that this fee is a surcharge imposed by the FCC that carriers charge to the end user. (5/8/07 Op. at 35 (citing 12/14 Tr. at 115-16)) Economou's testimony was corroborated by the bills MetTel submitted to Best, which include an FCC line fee. (5/8/07 Op. at 35 (citing Pltf. Ex. 2, at MET 19-21))

Best's complaint that "just a few pages from one of the bills" was offered into evidence (Best Br. at 33) does not suggest that inclusion of the FCC line charges in the lost profits award was clearly erroneous. Best was free to challenge MetTel's evidence by presenting bills that did not reflect an FCC line charge. It chose not to do so. There is no basis for this Court to find that the bankruptcy court erred in including the FCC line charges in the lost profits award.

## CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court for the Southern District of New York is AFFIRMED. This appeal is dismissed in its entirety and the Clerk of the Court is directed to close this case.

Dated: New York, New York          SO ORDERED.
       June 15, 2010

                                   Paul G. Gardephe
                                   United States District Judge